FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

2015 JAN 15 P 1:00

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| ABREHAM ZEMEDAGEGEHU<br>P.O. Box 58097<br>Washington, D.C. 20037<br><br>    Plaintiff,<br><br>v.<br><br>ARLINGTON COUNTY BOARD<br>SERVE ON:  Jay Fisetts, Chair<br>                 Arlington County Board<br>                 2100 Clarendon Blvd., Suite 300<br>                 Arlington, Virginia 22201<br><br>ARLINGTON COUNTY SHERIFF'S OFFICE<br>SERVE ON:  Elizabeth F. Arthur, Sheriff<br>                 1425 North Courthouse Rd.,<br>                 Suite 9100<br>                 Arlington, Virginia 22201<br><br>ARLINGTON COUNTY DETENTION<br>FACILITY<br>1435 North Courthouse Rd.<br>Arlington, Virginia 22201<br>SERVE ON:  Elizabeth F. Arthur, Sheriff<br>                 1425 North Courthouse Rd.,<br>                 Suite 9100<br>                 Arlington, Virginia 22201<br><br>    Defendants. | Civil Action No. 1:15CV57-JCC-TRJ<br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Abreham Zemedagegehu files this Complaint against Defendants the Arlington County Board, the Arlington County Sheriff's Office, and the Arlington County Detention Facility (collectively, the "Defendants") and states:

1

## PRELIMINARY STATEMENT

1. Abreham Zemedagegehu ("Plaintiff" or "Mr. Zemedagegehu"), an individual who is deaf, brings this case against the Defendants for failing to provide him with qualified American Sign Language ("ASL") interpreter services and other auxiliary aids or services necessary to ensure effective communication during his nearly six-week-long detention at the Arlington County Detention Facility. This failure, and the resulting consequences, violated Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12165 ("Title II"), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"). Mr. Zemedagegehu seeks declaratory relief, compensatory damages, and attorneys' fees and costs.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331.

3. Venue is proper in this judicial district under 28 U.S.C. § 1391 because a substantial part of the acts or omissions giving rise to this action occurred in Arlington, Virginia.

## THE PARTIES

4. Plaintiff Abreham Zemedagegehu resides in Washington, D.C. and does not have a permanent residential address at this time. Mr. Zemedagegehu is deaf and communicates primarily in ASL.

5. Defendant Arlington County Board (the "County Board") is the governing body for Arlington County. The County Board allocates funds for and engages in oversight over Defendant Arlington County Sheriff's Office. The County Board is a public entity subject to Title II. The County Board distributes federal financial assistance, including federal prisoner reimbursements, and is subject to Section 504.

6. Defendant Arlington County Sheriff's Office (the "Sheriff's Office") manages the Arlington County Detention Facility (the "Detention Facility"). The Sheriff's Office is a public entity subject to Title II. The Sheriff's Office is a recipient of federal financial assistance, including federal prisoner expense reimbursements, and is subject to Section 504.

7. Defendant Detention Facility is the jail for Arlington County. The Detention Facility is a public entity subject to Title II. The Detention Facility is a recipient of federal financial assistance, including federal prisoner expense reimbursements, and is subject to Section 504.

## FACTUAL ALLEGATIONS

*Background*

8. Mr. Zemedagegehu was born and raised in Ethiopia. He immigrated to the United States in 2001, and became a United States citizen in 2008.

9. Mr. Zemedagegehu is deaf and has limited English proficiency.

10. As a child, Mr. Zemedagegehu first learned Amharic, the language of Ethiopia. Later in his childhood, he learned Ethiopian Sign Language, the language of the deaf community in Ethiopia.

11. Mr. Zemedagegehu began learning ASL after immigrating to the United States in 2001. He considers himself fluent in ASL. ASL is a complete, complex language that employs signs made with the hands and other movements, including facial expressions and postures of the body. It is a language distinct from English – it is not simply English in hand signals – and has its own vocabulary and rules for grammar and discourse structure.

12. English is Mr. Zemedagegehu's fourth language. Mr. Zemedagegehu learned the little English he knows by taking courses through the English Language Institute at Gallaudet

University. He struggles to write and understand even basic English sentences. He has no functional ability to speak English or to read lips.

13.  Mr. Zemedagegehu's employment history is limited to manual labor jobs that did not require proficiency in spoken or written English. For example, he worked loading and unloading trucks at Federal Express.

14.  In 2010, Mr. Zemedagegehu left his job with Federal Express due to a lower back injury that had occurred in 2008. This injury requires him to wear a back brace and take daily medication.

*Plaintiff's Arrest*

15.  On the evening of February 2, 2014, Mr. Zemedagegehu went to Ronald Reagan Washington National Airport ("National Airport") to find a warm place to sleep.

16.  Shortly after entering National Airport, Mr. Zemedagegehu was arrested by officers of the Metropolitan Washington Airports Authority.

17.  Using gestures and in writing, Mr. Zemedagegehu informed the officers that he is deaf and did not understand them. He also requested an ASL interpreter in writing. The officers denied his request. Instead, the officers attempted to communicate with Mr. Zemedagegehu by writing information on a notepad.

18.  Because Mr. Zemedagegehu cannot read written English well, he did not know why he had been arrested.

19.  Mr. Zemedagegehu was in the custody of the Metropolitan Washington Airports Authority for only a short period of time before being transported to the Detention Facility, which is located in Arlington County, Virginia, close to National Airport.

20. Mr. Zemedagegehu was detained at the Detention Facility for nearly six weeks. During this time, despite Mr. Zemedagegehu's repeated requests, Defendants refused to provide any effective means for Mr. Zemedagegehu to communicate. As a result, Mr. Zemedagegehu did not understand why he had been arrested, could not communicate his needs or understand what was being said during booking or his medical evaluations, and could not inform the Detention Center of his medical needs and dietary restrictions. Because he could not understand the announcements and other communications made orally at the Detention Center, Mr. Zemedagegehu missed out on meals, recreation times, rehabilitative services, and other events at the Detention Facility. He also was unable to place telephone calls while at the Detention Center.

21. On many occasions when Mr. Zemedagegehu requested interpreter services either in writing or using gestures, he believes he was informed that interpreters were prohibited at the Detention Facility.

*Booking Process*

22. Mr. Zemedagegehu arrived at the Detention Facility during the early hours of February 3, 2014. Officers who worked for Defendants attempted to communicate with Mr. Zemedagegehu by speaking. However, Mr. Zemedagegehu was unable to understand what the officers were saying.

23. During this process, both in writing and using gestures, Mr. Zemedagegehu requested an ASL interpreter. Defendants refused to provide one.

24. Because Defendants did not provide an interpreter, Mr. Zemedagegehu did not know why he had been arrested or what to expect while he was detained.

25. During the booking process, the officers placed Mr. Zemedagegehu in front of a web camera, a microphone, and a computer monitor that appeared to show a judge on the screen. The judge on the monitor appeared to be speaking to Mr. Zemedagegehu, but he could not

5

understand what the judge was saying. Mr. Zemedagegehu attempted to signal that he was deaf, but officers in the room with Mr. Zemedagegehu directed him to stay still. Mr. Zemedagegehu does not know what occurred during that interaction with the judge.

26. At one point, one of Defendants' officers handed Mr. Zemedagegehu a piece of paper that was filled with writing. Mr. Zemedagegehu did not understand what it said and requested an ASL interpreter by writing on the paper. After requesting an interpreter, Mr. Zemedagegehu observed an officer placing a phone call. Upon information and belief, the phone call relayed Mr. Zemedagegehu's request for an interpreter to another prison officer.

27. When the phone call concluded, the officer denied Mr. Zemedagegehu's interpreter request.

28. Without an interpreter, Mr. Zemedagegehu did not understand what was taking place during the booking process. Thus, Mr. Zemedagegehu could not understand any of the Detention Facility's rules or procedures that might have been explained to him. Similarly, Mr. Zemedagegehu was unable to advise the Detention Facility personnel of critical information concerning himself, such as his dietary restrictions and medical needs.

29. On February 4, 2014, Mr. Zemedagegehu was arraigned. The Arlington General District Court provided an interpreter for his arraignment.

30. Not until his arraignment, more than 24 hours after his arrest, did Mr. Zemedagegehu first learn that he had been arrested and incarcerated for allegedly stealing an iPad.

*Medical Evaluations*

31. After booking, but before his arraignment, Defendants' employees sent Mr. Zemedagegehu for a medical evaluation.

6

32. The employee conducting the evaluation attempted to communicate with Mr. Zemedagegehu in writing, but Mr. Zemedagegehu did not understand what was written. He informed the evaluator that he did not understand and requested in writing an ASL interpreter. The evaluator refused to provide one.

33. Without an interpreter, Mr. Zemedagegehu was unable to explain to the employee that he had back problems and required a prescription. Consequently, throughout his entire six week incarceration at the Detention Facility, Mr. Zemedagegehu did not receive the medicine he requires to alleviate his back pain.

34. The evaluator handed Mr. Zemedagegehu what is now believed to be a consent form to sign for a medical procedure. Mr. Zemedagegehu could not read the form. He refused to sign it and asked in writing for an interpreter.

35. The evaluator summoned a second employee into the room. Mr. Zemedagegehu asked, in writing, for the second employee to provide an interpreter.

36. Instead of providing an interpreter, the second employee held down Mr. Zemedagegehu's arm and forced a needle into it. At the time, Mr. Zemedagegehu was confused as to what they were doing to his arm.

37. After the medical evaluation, an officer put Mr. Zemedagegehu into a jail cell by himself. Mr. Zemedagegehu did know why he was being placed in isolation.

38. Mr. Zemedagegehu was scared and confused during this time.

39. Mr. Zemedagegehu repeatedly banged on the door and gestured at the cameras to get an officer's attention to obtain an interpreter. He wanted the Detention Facility officers to explain to him what was happening: Mr. Zemedagegehu still did not know why he had been

arrested, why he was incarcerated, when he might be released, what had just been done to his arm, when he might be fed, or any other vital information.

40. Mr. Zemedagegehu's skin had a negative reaction to the forcible medical procedure that was conducted on his arm. Following this reaction, Mr. Zemedagegehu underwent an additional medical procedure. Once again, Defendants refused to provide an interpreter to explain this medical procedure. Because of the lack of communication, Mr. Zemedagegehu did not know what was happening to him or why. He remained in isolation for several days.

*Dietary Needs*

41. At some point during Mr. Zemedagegehu's isolation, one of Defendants' officers slid a tray of food into Mr. Zemedagegehu's cell. The food tray contained pork. Mr. Zemedagegehu does not eat pork for religious reasons.

42. Because Defendants refused to provide Mr. Zemedagegehu with an interpreter, he was unable to inform Defendants of his dietary restrictions.

43. As a result of the loneliness and frustration of being unable to effectively communicate with anyone, Mr. Zemedagegehu protested by refusing to eat for an extended period of time.

*Telephone Access*

44. After his arraignment, Mr. Zemedagegehu attempted to communicate to Defendants' officers that he needed to place a telephone call. In response, Defendants' officers gestured to a traditional telephone. Defendants' officers appeared to suggest to Mr. Zemedagegehu to use the traditional telephone on multiple occasions when he requested to make a phone call.

45. Because he is deaf, Mr. Zemedagegehu cannot place a call using a traditional telephone. Instead, Mr. Zemedagegehu places calls through a videophone.

8

46. A videophone is a device with a camera and a video monitor that allows both parties to see each other simultaneously, similar to Skype and FaceTime. Videophones allow deaf individuals to communicate with one another directly in ASL without having to communicate through written English. Any computer or smartphone with a camera and appropriate software can be used to place a videophone call.

47. Although Defendants state that the Detention Facility is "[o]ne of the most technically advanced 'Direct Supervision' jails in the country," upon information and belief, it does not have a videophone or any device equipped with videophone software.

48. Mr. Zemedagegehu repeatedly pleaded with Defendants' officers to let him place a call to his public defender. Finally, one of Defendants' officers took the piece of paper with the public defender's phone number on it and gestured to Mr. Zemedagegehu that the officer would place the call for him.

49. Mr. Zemedagegehu waited for the officer to return, but the officer never did.

50. Mr. Zemedagegehu did not find out whether the officer had followed through with placing the call for Mr. Zemedagegehu, or what else had happened, until days later, when a public defender appeared at the Detention Facility to see Mr. Zemedagegehu.

51. More than one week after Mr. Zemedagegehu began asking to make a phone call, Defendants' officers provided him with a teletypewriter ("TTY").

52. A TTY is an electronic device that allows typed communication to be sent to another TTY via a telephone line. Based on sixty-year-old technology, the TTY is basically a telephone equipped with a keyboard and a screen capable of displaying a single line of text, giving it less functionality than the text-messaging function of a cellular phone. For two parties to have a TTY conversation, each party must have a TTY. Though a TTY may be a helpful

communication tool, it ultimately relies on the user's ability to communicate in written English and, in all events, is a much more time-intensive communication tool than a telephone, computer, or any other modern communication device. A TTY conversation does not enable parties to communicate in ASL. TTY has been almost entirely supplanted by the videophone and most deaf individuals no longer have TTYs. They communicate by videophone or by using any number of computer programs that provide for more efficient video- and text-based communication, such as FaceTime, email, and instant messaging programs.

53. Mr. Zemedagegehu cannot communicate effectively using a TTY because a TTY requires proficiency in English. Mr. Zemedagegehu cannot read or write English well enough to carry on a conversation using written English. He can communicate effectively using a videophone because a videophone allows him to communicate in ASL.

54. Mr. Zemedagegehu attempted to use the TTY provided to call a friend, who is also deaf. Like Mr. Zemedagegehu and most other deaf individuals, she uses a videophone in place of a standard telephone. Also like Mr. Zemedagegehu and most other deaf individuals, she does not own a TTY; she owns only a videophone. A TTY cannot connect directly to a videophone.

55. Consequently, Mr. Zemedagegehu attempted to but could not place a telephone call to his friend or anyone else, including his attorney.

56. Upon information and belief, inmates at the Detention Center who can hear have access to a telephone to place outgoing calls.

57. Instead of Mr. Zemedagegehu placing the call to his friend, one of Defendants' officers placed the call for Mr. Zemedagegehu through a standard telephone. Because the officer was calling a deaf individual, the officer's call connected automatically to a videophone relay

service operator, who used a videophone to attempt to contact Mr. Zemedagegehu's friend and relay the guards communication in ASL to the friend. Because the friend did not answer and due to the communication limitations between the officer and Mr. Zemedagegehu, the officer apparently left a message for Mr. Zemedagegehu's friend to come to the Detention Facility. The message the friend received was in the format of a video message of the relay service operator using ASL to translate the officer's message. The video relay service can translate spoken English to ASL, but such relay service cannot receive TTY calls and translate those into ASL. Mr. Zemedagegehu could not use the relay service himself because he would have had to use the standard telephone.

58. Because Mr. Zemedagegehu could not communicate with his friend via telephone, his friend had to come to the Detention Facility to communicate with Mr. Zemedagegehu.

59. The Defendants never provided a different device other than a TTY for Mr. Zemedagegehu to make a telephone call. Because of the lack of a videophone, Mr. Zemedagegehu was unable to place telephone calls for the entire time he was detained.

*Meal and Recreation Times*

60. The Defendants' failure to provide auxiliary aids and services to ensure effective communication caused Mr. Zemedagegehu to miss meals and recreation times.

61. Upon information and belief, Defendants' personnel signaled the beginning of meal and recreation times by using an auditory alert. When inmates heard the alert, they could press a button that would open their cell doors. With the cell doors open, inmates could leave their cells and proceed to the cafeteria or recreation yard.

62. Because Mr. Zemedagegehu is deaf, he could not hear the auditory alerts.

63. After Detention Facility personnel moved Mr. Zemedagegehu out of isolation to the floor with the general population, Mr. Zemedagegehu was placed in a cell by himself. Mr.

11

Zemedagegehu would know that he could leave his cell only if he was looking outside his cell at the time the alert sounded. He would observe other inmates open their cell doors. Initially, Mr. Zemedagegehu did not understand that he had to press a button inside the cell for his door to open and so when he attempted to open the door, it would not open. Only after being placed in a cell with another inmate the next day, did Mr. Zemedagegehu learn that he had to press a button for the door to open.

64. On multiple occasions, Mr. Zemedagegehu was not looking outside his cell at the time the alert sounded, often because he was sleeping. Mr. Zemedagegehu would awaken to see that other inmates were outside of their cells. At that time, he would press the button to open his cell door, but the door would not open. He would attempt to signal to Defendants' officers to have them open his cell door, but they would not respond, causing Mr. Zemedagegehu to miss meals approximately two to three times per week and recreation times approximately once per week due to the lack of auxiliary aids or services, such as visual alerts.

*Rehabilitative Programming and Other Services*

65. Defendants deprived Mr. Zemedagegehu of access to rehabilitative programming and other services due to the lack of an ASL interpreter and other auxiliary aids and services.

66. Defendants' failure to provide Mr. Zemedagegehu with an ASL interpreter or other auxiliary aids and services resulted in Mr. Zemedagegehu being unable to understand what information, if any, Defendants might have provided about rehabilitative programming or other services during booking or throughout the nearly six weeks he spent at the Detention Facility. As a result, he was unaware of these programs or services while at the Detention Facility and therefore could not take advantage of them.

67. If Defendants had provided an ASL interpreter and other auxiliary aids and services, such as visual alerts and notifications, Mr. Zemedagegehu could have learned of and

would have participated in the various rehabilitative programming and other services offered by the Defendants at the Detention Facility.

68. Even in cases when Mr. Zemedagegehu did learn of available services from other inmates, he was unable to participate in or benefit from the services because Defendants failed to provide auxiliary aids and services necessary for him to have access to the services.

69. For example, Mr. Zemedagegehu believed that he could visit the Detention Center's library by putting his name on a certain list. Mr. Zemedagegehu wrote his name on what he believed to be the library list. Defendant's, however, never allowed Mr. Zemedagegehu to access the library. He does not know why. It is possible that Defendants called his name to visit the library, but Mr. Zemedagegehu could not hear his name being called and therefore was unable to respond.

70. Each of the many times that Mr. Zemedagegehu requested a sign language interpreter either in writing or using gestures, the Defendants refused to provide one.

71. By the time Mr. Zemedagegehu was released from Defendants' custody, he had spent six weeks in near-isolation, unable to effectively communicate with anyone at the Detention Center but the sole visitor he briefly had.

72. Throughout his detention, Mr. Zemedagegehu suffered anxiety, stress, loss of dignity, and frustration due to the intense isolation and repeated instances of exclusion from or limited participation in Defendants' programs, services, and activities.

## COUNT I
### (Title II of the Americans With Disabilities Act)

73. Mr. Zemedagegehu repeats and re-alleges each and every allegation above as if fully set forth herein.

74. On July 12, 1990, Congress enacted the Americans with Disabilities Act ("ADA") "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

75. Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

76. Title II of the ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

77. Mr. Zemedagegehu has a disability because he is substantially limited in the major life activities of hearing and speaking. He also meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity. He is therefore a "qualified individual with a disability" under Title II of the ADA.

78. The County Board is the governing body for Arlington County; as such, it is a "public entity" within the meaning of the ADA, 42 U.S.C. § 12131(1)(B).

79. The Sheriff's Office is a department, agency, special purpose district, or other instrumentality of Arlington County; as such, it is a "public entity" within the meaning of the ADA, 42 U.S.C. § 12131(1)(B).

80. The Detention Facility is a department, agency, special purpose district, or other instrumentality of Arlington County; as such, it is a "public entity" within the meaning of the ADA, 42 U.S.C. § 12131(1)(B).

81. At all times relevant to this action, the ADA was in full force and effect in the United States and Mr. Zemedagegehu had a right not to be subjected by Defendants to discrimination on the basis of his disability. 42 U.S.C. § 12132.

82. Defendants knowingly failed to provide Mr. Zemedagegehu with an ASL interpreter and other necessary auxiliary aids or services resulting in Mr. Zemedagegehu being:

   a. Unable to effectively communicate with Defendants' officers and other personnel during the booking process;
   b. Unable to effectively communicate with Defendants' personnel performing medical functions;
   c. Unable to effectively communicate dietary needs;
   d. Deprived of access to telephone calls;
   e. Deprived of access to meals and recreation times; and
   f. Deprived of knowledge of and access to rehabilitative programming and other services.

83. These failures violated Mr. Zemedagegehu's rights under Title II of the ADA.

84. Defendants knew of the substantial likelihood of a violation of Mr. Zemedagegehu's federally protected rights and failed to act on this likelihood.

85. Upon information and belief, the failure to provide effective communication to deaf individuals, such as Mr. Zemedagegehu, and the failure to provide comparable access to services, programs, and activities as provided to hearing individuals are policies, regular practices, or customs of the Defendants. This failure is ongoing and continues to date.

86. As a result of Defendants' violation of the ADA, Mr. Zemedagegehu has suffered discrimination, exclusion from services, benefits, activities, programs, and privileges, loss of

dignity, frustration, humiliation, emotional pain and suffering, anxiety, trauma, embarrassment, and injury to his physical and mental health.

## COUNT II
## (Section 504 of The Rehabilitation Act of 1973)

87. Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

88. Section 504 states "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."

89. Plaintiff is substantially limited in the major life activities of hearing and speaking; as such, he is an individual with a disability under 29 U.S.C. § 705(20)(B) who is qualified under Section 504.

90. The County Board is a program or activity that distributes federal financial assistance within the meaning of 29 U.S.C. § 794(b)(1), because it distributes money to the Sheriff's Office from the General Fund. Upon information and belief, this money includes federal prisoner expense reimbursements.

91. The Sheriff's Office is a recipient of federal financial assistance within the meaning of 29 U.S.C. § 794(b)(1), (4) because it receives federal financial assistance, including but not limited to federal prisoner expense reimbursements.

92. The Detention Facility is a program or activity receiving federal financial assistance within the meaning of 29 U.S.C. § 794(b) because it receives federal financial assistance, including federal prisoner expense reimbursements.

16

93. At all times relevant to this action, Section 504 was in full force and effect in the United States and Mr. Zemedagegehu had a right not to be subjected to discrimination on the basis of his disability by Defendants.

94. Defendants knowingly failed to provide Mr. Zemedagegehu with an ASL interpreter and other necessary auxiliary aids or services resulting in Mr. Zemedagegehu being:

    a. Unable to effectively communicate with Defendants' guards and other personnel during the booking process;
    b. Unable to effectively communicate with Defendants' employees performing medical functions;
    c. Unable to effectively communicate dietary needs;
    d. Deprived of access to telephone calls;
    e. Deprived of access to meals and recreation times; and
    f. Deprived of knowledge of and access to rehabilitative programming and other services.

95. These failures violated Mr. Zemedagegehu's rights under Section 504.

96. Defendants knew of the substantial likelihood of a violation of Mr. Zemedagegehu's federally protected rights and failed to act on this likelihood.

97. Upon information and belief, the failure to provide effective communication to deaf individuals, such as Mr. Zemedagegehu, and the failure to provide comparable access to services, programs, and activities as provided to hearing individuals are policies, regular practices, or customs of the Defendants. This failure is ongoing and continues to date.

98. As a result of the Defendants' violation of Section 504, Mr. Zemedagegehu has suffered discrimination, exclusion from services, benefits, activities, programs, and privileges, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, trauma, embarrassment, and injury to his physical and mental health.

## JURY DEMAND

99. Plaintiff hereby demands that this action be tried before a jury.

## PRAYER FOR RELIEF

100. WHEREFORE, Plaintiff respectfully requests that the Court provide the following relief:

    a. Declare that Defendants' refusal to provide a qualified ASL interpreter and other necessary auxiliary aids or services to ensure effective communication with Mr. Zemedagegehu violated Title II of the ADA and Section 504 of the Rehabilitation Act;

    b. Award compensatory damages as a result of the violations of Title II of the ADA and Section 504 of the Rehabilitation Act in an amount to be determined at trial;

    b. Award reasonable costs and attorneys' fees; and

    c. Award any and all other legal or equitable relief that the Court deems necessary and appropriate.

Dated: January 15, 2015

Respectfully submitted,

By: _____
Larry Tanenbaum (*pro hac vice motion forthcoming*)
Jonathan Goodrich (VSB 78522)
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue N.W.
Washington, DC 20036
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
Email: jgoodrich@akingump.com
*Counsel for Plaintiff**

Caroline E. Jackson, Esq. (*pro hac vice forthcoming*)
Debra J. Patkin, Esq. (*pro hac vice forthcoming*)
NATIONAL ASSOCIATION OF THE DEAF
LAW AND ADVOCACY CENTER
8630 Fenton Street, Suite 820
Silver Spring, MD 20910
Telephone: (301) 587-7466
Facsimile: (301) 587-1791
Email: caroline.jackson@nad.org
*Counsel for Plaintiff**

\* Counsel for Plaintiff gratefully acknowledge the support and work of the following students from the University of Maryland Carey School of Law: Juliana Kim, Jamie Lee, and Michael Levin.