**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| ABREHAM ZEMEDAGEGEHU | ) | |
| P.O. Box 58097 | ) | |
| Washington, D.C. 20037 | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | Civil Action No. 1:15-CV-57-JCC-TRJ |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| ARLINGTON COUNTY SHERIFF | ) | |
| ELIZABETH F. ARTHUR IN HER | ) | |
| OFFICIAL CAPACITY | ) | |
| SERVE ON:  Elizabeth F. Arthur, Sheriff | ) | |
|                1425 North Courthouse Rd., | ) | |
|                Suite 9100 | ) | |
|                Arlington, Virginia 22201 | ) | |
| | ) | |
| VIRGINIA DEPARTMENT OF CORRECTIONS | ) | |
| SERVE ON:  Harold W. Clarke, Director | ) | |
|                6900 Atmore Drive | ) | |
|                Richmond, Virginia 23225 | ) | |
| | ) | |
| VIRGINIA DEPARTMENT OF CORRECTIONS | ) | |
| DIRECTOR HAROLD W. CLARKE IN HIS | ) | |
| OFFICIAL CAPACITY | ) | |
| SERVE ON:  Harold W. Clarke, Director | ) | |
|                6900 Atmore Drive | ) | |
|                Richmond, Virginia 23225 | ) | |
| | ) | |
| VIRGINIA BOARD OF CORRECTIONS | ) | |
| SERVE ON:  Carl R. Peed, Chairman | ) | |
|                6900 Atmore Drive | ) | |
|                Richmond, Virginia 23225 | ) | |
| | ) | |
| VIRGINIA BOARD OF CORRECTIONS | ) | |
| CHAIRMAN CARL R. PEED IN HIS OFFICIAL | ) | |
| CAPACITY | ) | |
| SERVE ON:  Carl R. Peed, Chairman | ) | |
|                6900 Atmore Drive | ) | |
|                Richmond, Virginia 23225 | ) | |
| | ) | |
|     Defendants. | ) | |

1

## FIRST AMENDED COMPLAINT

Plaintiff Abreham Zemedagegehu files this First Amended Complaint against Defendants Arlington County Sheriff Elizabeth F. Arthur in her official capacity, the Virginia Department of Corrections ("VDOC"), Harold W. Clarke in his official capacity as VDOC's Director, the Virginia Board of Corrections (the "Board"), and Carl R. Peed in his official capacity as the Board's Chairman (collectively, the "Defendants") and states:

## PRELIMINARY STATEMENT

1.      Abreham Zemedagegehu ("Plaintiff" or "Mr. Zemedagegehu"), an individual who is deaf, brings this case against the Defendants for failing to provide American Sign Language ("ASL") interpreter services and other auxiliary aids or services necessary to ensure effective communication during his nearly six-week-long detention at the Arlington County Detention Facility (the "Detention Facility"), intentional discrimination, and maintaining policies and procedures that had a disparate impact on Mr. Zemedagegehu because of his disability. These actions and inactions, and the resulting consequences, violated Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12165 ("Title II"), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"). Mr. Zemedagegehu seeks compensatory damages and attorneys' fees and costs.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331.

3.      Venue is proper in this judicial district under 28 U.S.C. § 1391 because a substantial part of the acts or omissions giving rise to this action occurred in Arlington, Virginia.

## THE PARTIES

4.      Plaintiff Abreham Zemedagegehu resides in Washington, D.C. and does not have a permanent residential address at this time. Mr. Zemedagegehu is deaf and communicates primarily in ASL.

5.      Defendant Arlington County Sheriff Elizabeth F. Arthur, in her official capacity, (the "Sheriff") manages and directs the Arlington County Sheriff's Office and the Arlington County Detention Facility (the "Detention Facility"). The Sheriff is responsible for the day-to-day operations of the Sheriff's Office and the Detention Facility. All personnel who work at the Detention Facility are employees of the Sheriff and/or the Sheriff's Office. The Sheriff's Office, which is managed and directed by the Sheriff, is a public entity subject to Title II. The Sheriff and her Office are recipients of federal financial assistance, including federal prisoner expense reimbursements, and are subject to Section 504.

6.      Defendant Virginia Board of Corrections (the "Board") is a nine-member, policy-making Board appointed by the Governor of Virginia and subject to confirmation by the Virginia General Assembly. The Detention Facility, where Plaintiff was detained, is a correctional complex that must meet the minimum standards set by the Board. The Board is a public entity subject to Title II, and, upon information and belief, is also a recipient of federal financial assistance, making it subject to Section 504.

7.      Carl R. Peed is the Chairman of the Board. As head of the Board, Chairman Peed is responsible for setting the minimum standards for the Commonwealth's jails, which include, but are not limited to: (1) requiring that upon intake each inmate be provided with information on how to obtain medical treatment and all other rules of conduct and policies and procedures governing inmate discipline; (2) requiring that upon intake all inmates receive a medical screening to include obtaining any information on special dietary requirements, current

3

medications, and other health conditions; (3) providing telephone access during booking and detention, including for deaf and hard of hearing individuals; (4) ensuring each inmate is aware of all jail programs and is provided educational opportunities; (5) allowing for participation in religious services or counseling; (7) maintaining a written statement of the jail's policies and procedures; and (8) providing access to a grievance procedure for all inmates. Chairman Peed is sued in his official capacity.

8.     Defendant Virginia Department of Corrections ("VDOC") is the Virginia state agency responsible for the supervision and custody of inmates and offenders and ensuring that each Virginia jail meets all minimum standards set by the Board. As a department of the Commonwealth, VDOC is a public entity subject to Title II, and is also a recipient of federal financial assistance including federal prisoner expense reimbursements, Medicaid funds, and a federal grant made pursuant to the Prison Rape Elimination Act, making it subject to Section 504.

9.     Harold W. Clarke is the Director of VDOC. Director Clarke is responsible for the management and oversight of VDOC's jails and correctional institutions as well as any other correctional facilities managed by Virginia sheriffs, superintendents, or regional institutions or authorities. Upon information and belief, the majority of inmates in Virginia's correctional facilities are in local and regional jails managed by Virginia sheriffs or superintendents. Each jail must meet all minimum standards set by the Board to be certified by VDOC. Director Clarke is sued in his official capacity.

10.     All individual named defendants are sued in their official capacities.  At all relevant times, all Defendants were acting under color of state law, pursuant to their authority as officials, agents, contractors, or employees of the Commonwealth of Virginia; within the scope

of their employment as representatives of public entities, as defined in 42 U.S.C. § 12131(1); and as representatives of a "department, agency, special purpose district, or other instrumentality of a State" under 29 U.S.C. § 794.

## FACTUAL ALLEGATIONS

### *Background*

11.     Mr. Zemedagegehu was born and raised in Ethiopia. He immigrated to the United States in 2001, and became a United States citizen in 2008.

12.     Mr. Zemedagegehu is deaf and has limited English proficiency.

13.     As a child, Mr. Zemedagegehu learned Ethiopian Sign Language, the language of the deaf community in Ethiopia.

14.     Mr. Zemedagegehu began learning ASL after immigrating to the United States in 2001. He currently uses ASL as his primary language. ASL is a complete, complex language that employs signs made with the hands and other movements, including facial expressions and postures of the body. It is a language distinct from English – it is not English in hand signals – and has its own vocabulary and rules for grammar and discourse structure.

15.     Mr. Zemedagegehu learned the little English he knows by taking courses through the English Language Institute at Gallaudet University. He struggles to write and understand even basic English sentences. He has no functional ability to speak English or to read lips.

16.     Mr. Zemedagegehu's employment history is limited to manual labor jobs that do not require proficiency in spoken or written English. For example, he worked loading and unloading trucks at Federal Express.

17.     In 2010, Mr. Zemedagegehu left his job with Federal Express due to a lower back injury that had occurred in 2008. This injury requires him to wear a back brace and take daily medication.

### *Plaintiff's Arrest*

18.     On the evening of February 2, 2014, Mr. Zemedagegehu went to Ronald Reagan Washington National Airport ("National Airport") to find a warm place to sleep.

19.     Shortly after entering National Airport, Mr. Zemedagegehu was arrested by officers of the Metropolitan Washington Airports Authority.

20.     Using gestures and in writing, Mr. Zemedagegehu informed the officers that he is deaf and did not understand them. He also requested an ASL interpreter in writing. The officers denied his request. Instead, the officers attempted to communicate with Mr. Zemedagegehu by writing information on a notepad.

21.     Because Mr. Zemedagegehu cannot read written English well, he did not understand what the officers wrote and did not know why he had been arrested.

22.     Mr. Zemedagegehu was in the custody of the Metropolitan Washington Airports Authority for only a short period of time before being transported to the Detention Facility, which is located in Arlington County, Virginia, close to National Airport.

### *Plaintiff's Detention*

23.     Mr. Zemedagegehu was detained at the Detention Facility for nearly six weeks. During this time, despite Mr. Zemedagegehu's repeated requests, Defendants refused to provide any effective means for Mr. Zemedagegehu to communicate. As a result, Mr. Zemedagegehu did not understand why he had been arrested, could not communicate his needs or understand what was being said during booking or his medical evaluations, and could not inform the Detention Facility personnel of his medical needs and dietary restrictions. Because he could not understand

6

the announcements and other communications made orally at the Detention Facility, Mr. Zemedagegehu missed out on meals, recreation times, rehabilitative services, and other events at the Detention Facility. He also was unable to place telephone calls while at the Detention Facility, severely restricting his access to counsel.

24.     On many occasions when Mr. Zemedagegehu requested interpreter services either in writing or using gestures, he believes he was informed that interpreters were prohibited at the Detention Facility.

### *Booking Process*

25.     Mr. Zemedagegehu arrived at the Detention Facility during the early hours of February 3, 2014. Detention Facility personnel attempted to communicate with Mr. Zemedagegehu by speaking. However, Mr. Zemedagegehu was unable to understand what the officers were saying.

26.     During this process, both in writing and using gestures, Mr. Zemedagegehu requested an ASL interpreter. Detention Facility personnel refused to provide one.

27.     Because the Detention Facility did not provide an interpreter, Mr. Zemedagegehu did not know why he had been arrested or what to expect while he was detained.

28.     During the booking process, the officers placed Mr. Zemedagegehu in front of a web camera, a microphone, and a computer monitor that appeared to show a judge on the screen. The judge on the monitor appeared to be speaking to Mr. Zemedagegehu, but he could not understand what the judge was saying. Mr. Zemedagegehu attempted to signal that he was deaf, but officers in the room with Mr. Zemedagegehu directed him to stay still. Mr. Zemedagegehu does not know what occurred during that interaction with the judge.

29.     At one point, one of the Detention Facility officers handed Mr. Zemedagegehu a piece of paper that was filled with writing. Mr. Zemedagegehu did not understand what it said

and requested an ASL interpreter by writing on the paper. After requesting an interpreter, Mr. Zemedagegehu observed an officer placing a phone call. Upon information and belief, the phone call relayed Mr. Zemedagegehu's request for an interpreter to another prison officer.

30.     When the phone call concluded, the officer denied Mr. Zemedagegehu's interpreter request.

31.     Without an interpreter, Mr. Zemedagegehu did not understand what was taking place during the booking process. Thus, Mr. Zemedagegehu could not understand any of the Detention Facility's rules or procedures that might have been explained to him. Similarly, Mr. Zemedagegehu was unable to advise the Detention Facility personnel of critical information concerning himself, such as his dietary restrictions and medical needs.  These actions, among others, unlawfully discriminated against Mr. Zemedagegehu and denied him the due process and equal protection afforded to non-deaf inmates.

32.     On February 4, 2014, Mr. Zemedagegehu was arraigned. The Arlington General District Court provided an interpreter for his arraignment.

33.     Not until his arraignment, more than 24 hours after his arrest, did Mr. Zemedagegehu first learn that he had been arrested and incarcerated for allegedly stealing an iPad.

34.     The lack of access to communication during the booking process exacerbated the feelings of frustration, humiliation, anger, anxiety, isolation, confusion, and loss of dignity that Mr. Zemedagegehu otherwise would have experienced as a result of his arrest and detention.

### *Medical Evaluations*

35.     After booking, but before his arraignment, Mr. Zemedagegehu underwent a medical evaluation at the Detention Facility.

36.     The employee conducting the evaluation attempted to communicate with Mr. Zemedagegehu in writing, but Mr. Zemedagegehu did not understand what was written. He informed the evaluator that he did not understand and requested in writing an ASL interpreter. The evaluator refused to provide one.

37.     Without an interpreter, Mr. Zemedagegehu was unable to explain to the employee that he had back problems and required a prescription. Consequently, throughout his entire six week incarceration at the Detention Facility, Mr. Zemedagegehu did not receive the medicine he requires to alleviate his back pain.

38.     The evaluator handed Mr. Zemedagegehu what is now believed to be a consent form to sign for a medical procedure. Mr. Zemedagegehu could not read the form. He refused to sign it and asked in writing for an interpreter.

39.     The evaluator summoned a second employee into the room. Mr. Zemedagegehu asked, in writing, for the second employee to provide an interpreter.

40.     Instead of providing an interpreter, the second employee held down Mr. Zemedagegehu's arm and forced a needle into it. At the time, Mr. Zemedagegehu was confused as to what they were doing to his arm.

41.     After the medical evaluation, an officer put Mr. Zemedagegehu into a jail cell by himself. Mr. Zemedagegehu did know why he was being placed in isolation.

42.     Mr. Zemedagegehu was scared and confused during this time.

43.     Mr. Zemedagegehu repeatedly banged on the door and gestured at the cameras to get an officer's attention to obtain an interpreter. He wanted the Detention Facility officers to explain to him what was happening: Mr. Zemedagegehu still did not know why he had been

arrested, why he was incarcerated, when he might be arraigned, when he might be released, what had just been done to his arm, when he might be fed, or any other vital information.

44.     Mr. Zemedagegehu's skin had a negative reaction to the forcible medical procedure that was conducted on his arm. Following this reaction, Mr. Zemedagegehu underwent an additional medical procedure. Once again, Defendants refused to provide an interpreter to explain this medical procedure. Because of the lack of communication, Mr. Zemedagegehu did not know what was happening to him or why. He remained in isolation for several days.

45.     The lack of communication during the medical procedures and the administration of these procedures without Mr. Zemedagegehu's consent exacerbated the feelings of frustration, humiliation, anger, anxiety, isolation, confusion, and loss of dignity that Mr. Zemedagegehu otherwise would have experienced as a result of his detention.

### *Dietary Needs*

46.     At some point during Mr. Zemedagegehu's isolation, one of the Detention Facility's officers slid a tray of food into Mr. Zemedagegehu's cell. The food tray contained pork. Mr. Zemedagegehu does not eat pork for religious reasons.

47.     Because Defendants refused to provide Mr. Zemedagegehu with an interpreter, he was unable to inform Detention Facility personnel of his religious and dietary restrictions.

48.     As a result of the loneliness and frustration of being unable to effectively communicate with anyone and the denial of equal treatment, Mr. Zemedagegehu protested by refusing to eat for an extended period of time.

### *Telephone Access*

49.     After his arraignment, Mr. Zemedagegehu attempted to communicate to Detention Facility officers that he needed to place a telephone call. In response, the officers gestured to a

traditional telephone. The officers appeared to suggest to Mr. Zemedagegehu to use the

traditional telephone on multiple occasions when he requested to make a phone call.

50.     Because he is deaf, Mr. Zemedagegehu cannot place a call using a traditional

telephone. Instead, Mr. Zemedagegehu places calls through a videophone.

51.     A videophone is a device with a camera and a video monitor that allows both

parties to see each other simultaneously, similar to Skype and FaceTime. Videophones allow deaf

individuals to communicate with one another directly in ASL without having to communicate

through written English. Any computer or smartphone with a camera and appropriate software

can be used to place a videophone call.

52.     Although Defendant Sheriff states that the Detention Facility is "[o]ne of the most

technically advanced 'Direct Supervision' jails in the country," upon information and belief, it

does not have a videophone or any device equipped with videophone software. *See* Sheriff,

Detention Facility, http://sheriff.arlingtonva.us/detention-facility/ (last visited February 19,

2015).

53.     Mr. Zemedagegehu repeatedly pleaded with the officers to let him place a call to

his public defender. Finally, one of the officers took the piece of paper with the public defender's

phone number on it and gestured to Mr. Zemedagegehu that the officer would place the call for

him.

54.     Mr. Zemedagegehu waited for the officer to return, but the officer never did.

55.     Mr. Zemedagegehu did not find out whether the officer had followed through with

placing the call for Mr. Zemedagegehu, or what else had happened, until days later, when a

public defender appeared at the Detention Facility to see Mr. Zemedagegehu. However, the

public defender did not have an ASL interpreter. As a result, they were unable to effectively communicate, significantly impairing Mr. Zemedagegehu's access to counsel.

56.     More than one week after Mr. Zemedagegehu began asking to make a phone call, the officers provided him with a teletypewriter ("TTY").

57.     A TTY is an electronic device that allows typed communication to be sent to another TTY via a telephone line. Based on sixty-year-old technology, the TTY is basically a telephone equipped with a keyboard and a screen capable of displaying a single line of text, giving it less functionality than the text-messaging function of a cellular phone. For two parties to have a TTY conversation, each party must have a TTY. Though a TTY may be a helpful communication tool in some circumstances, it ultimately relies on the user's ability to communicate in written English and, in all events, is a much more time-intensive communication tool than a telephone, computer, or any other modern communication device. A TTY conversation does not enable parties to communicate in ASL. The TTY has been almost entirely supplanted by the videophone and most deaf individuals no longer have TTYs. They communicate by videophone or by using any number of computer programs that provide for more efficient video- and text-based communication, such as FaceTime, email, and instant messaging programs.

58.     Mr. Zemedagegehu cannot communicate effectively using a TTY because a TTY requires proficiency in English. Mr. Zemedagegehu cannot read or write English well enough to carry on a conversation using written English. He can communicate effectively using a videophone because a videophone allows him to communicate in ASL.

59.     Mr. Zemedagegehu attempted to use the TTY provided to call a friend, who is also deaf. Like Mr. Zemedagegehu and most other deaf individuals, she uses a videophone in

place of a standard telephone. Also like Mr. Zemedagegehu and most other deaf individuals, she does not own a TTY; she owns only a videophone. A TTY cannot connect directly to a videophone.

60.     Consequently, Mr. Zemedagegehu attempted to but could not place a telephone call to his friend.

61.     Upon information and belief, inmates at the Detention Facility who can hear have access to a telephone to place outgoing calls.  Accordingly, Mr. Zemedagegehu was denied equal access to basic services that the Sheriff offers at the Detention Facility.

62.     Instead of Mr. Zemedagegehu placing the call to his friend, one of the Detention Facility's officers placed the call for Mr. Zemedagegehu through a standard telephone. Because the officer was calling a deaf individual, the officer's call connected automatically to a videophone relay service operator, who used a videophone to attempt to contact Mr. Zemedagegehu's friend and relay the guard's communication in ASL to the friend. Because the friend did not answer and due to the communication limitations between the officer and Mr. Zemedagegehu, the officer apparently left a message for Mr. Zemedagegehu's friend to come to the Detention Facility. The message the friend received was in the format of a video message of the relay service operator using ASL to translate the officer's message. The video relay service can translate spoken English to ASL, but such relay service cannot receive TTY calls and translate those into ASL. Mr. Zemedagegehu could not use the relay service himself because he would have had to use the standard telephone.

63.     Because Mr. Zemedagegehu could not communicate with his friend via telephone, his friend had to come to the Detention Facility to communicate with Mr. Zemedagegehu.

64.     The Sheriff never provided a different device other than a TTY for Mr. Zemedagegehu to make a telephone call. Because of the lack of a videophone, Mr. Zemedagegehu was unable to place telephone calls for the entire time he was detained.

65.     The lack of telephone access exacerbated the feelings of frustration, humiliation, anger, anxiety, isolation, confusion, and loss of dignity that Mr. Zemedagegehu otherwise would have experienced as a result of his detention.

### *Assistance of Counsel*

66.     Due to the lack of telephone access, Mr. Zemedagegehu could not place or receive telephone calls to anyone, including his attorney.

67.     As a result, Mr. Zemedagegehu could access his attorney only when the attorney came to the Detention Facility of his own accord. Mr. Zemedagegehu had no other means of contacting his attorney to ask the attorney to come to the Detention Facility or even to ask a simple question. If Mr. Zemedagegehu had had access to a videophone, he could have used the relay service to communicate with his attorney in ASL; consequently, he would have been able to ask questions, understand the answer, and otherwise participate in his own defense.

68.     Upon information and belief, inmates who are not deaf can contact their attorneys by telephone, ask questions, understand the answer, and thus participate in their own defense.

69.     The lack of access to counsel exacerbated the feelings of frustration, humiliation, anger, anxiety, isolation, confusion, and loss of dignity that Mr. Zemedagegehu otherwise would have experienced as a result of his detention.

### *Meals and Recreation Times*

70.     The Defendants' discrimination and failure to provide auxiliary aids and services to ensure effective communication caused Mr. Zemedagegehu to miss meals and recreation times.

71.     Upon information and belief, Detention Facility personnel signaled the beginning of meal and recreation times by using an auditory alert. When inmates heard the alert, they could press a button that would open their cell doors. With the cell doors open, inmates could leave their cells and proceed to the cafeteria or recreation yard.

72.     Because Mr. Zemedagegehu is deaf, he could not hear the auditory alerts.

73.     After Detention Facility personnel moved Mr. Zemedagegehu out of isolation to the floor with the general population, Mr. Zemedagegehu was placed in a cell by himself. Mr. Zemedagegehu would know that he could leave his cell only if he was looking outside his cell at the time the alert sounded. He would observe other inmates open their cell doors. Initially, Mr. Zemedagegehu did not understand that he had to press a button inside the cell for his door to open and so when he attempted to open the door, it would not open. Only after being placed in a cell with another inmate did Mr. Zemedagegehu learn that he had to press a button for the door to open.

74.     On multiple occasions, Mr. Zemedagegehu was not looking outside his cell at the time the alert sounded, often because he was sleeping. Mr. Zemedagegehu would awaken to see that other inmates were outside of their cells. At that time, he would press the button to open his cell door, but the door would not open. He would attempt to signal to Detention Facility officers to have them open his cell door, but they would not respond, causing Mr. Zemedagegehu to miss meals approximately two to three times per week and recreation times approximately once per week due to the lack of auxiliary aids or services, such as visual alerts.

75.     The lack of access to meals and recreation times exacerbated the feelings of frustration, humiliation, anger, anxiety, isolation, confusion, and loss of dignity that Mr. Zemedagegehu otherwise would have experienced as a result of his detention.

*Rehabilitative Programming and Other Services*

76.     Defendants deprived Mr. Zemedagegehu of access to rehabilitative programming and other services due to the lack of an ASL interpreter and other auxiliary aids and services, their intentional discrimination, and their implementation and maintenance of policies and procedures that had a disparate impact on Mr. Zemedagegehu because of his disability.

77.     Those actions and inactions by the Defendants' resulted in Mr. Zemedagegehu being unable to understand what information, if any, the Sheriff might have provided about rehabilitative programming or other services during booking or throughout the nearly six weeks he spent at the Detention Facility. As a result, he was unaware of these programs or services while at the Detention Facility and therefore could not take advantage of them.

78.     If Defendants had provided an ASL interpreter and other auxiliary aids and services, such as visual alerts and notifications, Mr. Zemedagegehu could have learned of and would have participated in the various rehabilitative programming and other services offered by the Sheriff at the Detention Facility.

79.     Even in cases when Mr. Zemedagegehu did learn of available services from other inmates, he was unable to participate in or benefit from the services because of Defendants' failure to provide auxiliary aids and services necessary for him to have access to the services and other discriminatory actions and inactions.

80.     For example, Mr. Zemedagegehu believed that he could visit the Detention Facility's library by putting his name on a certain list. Mr. Zemedagegehu wrote his name on what he believed to be the library list. The officers, however, never allowed Mr. Zemedagegehu to access the library. He does not know why. It is possible that an officer called his name to visit the library, but Mr. Zemedagegehu could not hear his name being called and therefore was unable to respond.

81. Each of the many times that Mr. Zemedagegehu requested a sign language interpreter either in writing or using gestures, the Sheriff refused to provide one.

82. By the time Mr. Zemedagegehu was released from the Sheriff's custody, he had spent six weeks in near-isolation, unable to effectively communicate with anyone at the Detention Facility but the sole visitor he briefly had.

83. Throughout his detention, Mr. Zemedagegehu suffered frustration, humiliation, anger, anxiety, isolation, confusion, and loss of dignity due to the intense isolation and repeated instances of exclusion from or limited participation in Defendants' programs, services, and activities.

### State Agency Defendants' Knowledge of Discrimination Against Deaf Inmates

84. Mr. Zemedagegehu was discriminated against and denied access to effective communication by the Sheriff at the Detention Facility, which is a VDOC-certified correctional facility. (VDOC, its Director, the Board, and its Chairman are referred to herein as the "State Agency Defendants.") VDOC-certified facilities are required to comply with minimum standards set by the Board.

85. The Board establishes minimum standards to ensure the health, safety, and welfare of all correctional facility inmates. The Board's responsibility to create minimum standards in Virginia's jails includes maintaining oversight over any policies and procedures regarding the treatment of and services provided to disabled inmates and detainees.

86. VDOC monitors and enforces these and other Board standards throughout the local jails, state correctional facilities, residential centers, probation and parole offices and other programs and facilities that make up the Commonwealth of Virginia's correctional system.

87.     The State Agency Defendants are – or should be – aware of their obligations under Title II and Section 504, including the requirement that deaf inmates be provided with accommodations to enable them to enjoy the same services, privileges, facilities, advantages, and accommodations made available to non-deaf inmates. The State Agency Defendants' knowledge of their duties and responsibilities owed to inmates with disabilities stems in part from the self-evaluation requirements found in the regulations implementing both Title II, 28 C.F.R. § 35.105, and Section 504, 45 C.F.R. § 84.6(c). The State Agency Defendants' knowledge of their duties and responsibilities owed to deaf inmates in particular has been reinforced over the last fifteen years through a series of lawsuits deaf inmates have brought against state entities in Virginia for their repeated failure to abide by their legal obligations towards deaf inmates and detainees.

88.     These lawsuits include *Hill v. Virginia Dept. of Corrections*, No. 948-4 (Va. Cir. Ct. 2002), wherein Otis Hill, a deaf inmate, sued VDOC for failure to provide him with a sign language interpreter that would enable him to participate in prison-run classes. VDOC eventually reached a settlement agreement with Hill, requiring VDOC to, among other things, provide Hill with a "qualified, certified sign language interpreter."

89.     In 2009, VDOC settled a lawsuit brought by a hard of hearing inmate who challenged a disciplinary action brought against him for missing morning count, on the ground that his hearing impairment prevented him from hearing the prison alerts. *Sorrells v. Wheeler*, No. 3:08-cv-39 (W.D. Va. 2009).

90.     Within a year of the *Sorrells* settlement, VDOC inmates who were deaf or hard of hearing filed a class action lawsuit in the U.S. District Court for the Eastern District of Virginia in Alexandria, alleging that VDOC and other related individuals and entities violated the ADA, Section 504, and Virginia State law by failing to provide deaf and hard of hearing inmates with

necessary access to qualified sign language interpreters, notification of daily events and safety announcements, and means to communicate with individuals outside of prison. *Minnis v. Johnson*, 1:10-cv-00096-TSE-TRJ (E.D. Va. Jan. 29, 2010). On October 13, 2010, the plaintiffs and the VDOC defendants reached a settlement agreement ("*Minnis* Settlement Agreement") in which the defendants agreed to provide qualified sign language interpreters and other auxiliary aids and services necessary to ensure that deaf inmates "have full and equal enjoyment" of all privileges and services as that of similarly situated non-deaf inmates. Among other things, under the *Minnis* Settlement Agreement, VDOC agreed to do the following:

A. Provide deaf inmates with access to qualified interpreters during the booking process.

B. Provide deaf inmates with access to qualified interpreters in situations concerning medical care, including scheduled appointments between deaf inmates and medical providers and during unscheduled medical emergencies.

C. Provide deaf inmates "with telecommunication devices so that they will have access to communication with people outside of VDOC that is substantially on the same basis as the access to telecommunication VDOC provides inmates who are not Deaf." In addition, VDOC agreed to "share a list of communications equipment available to Deaf inmates upon their arrival at the facility." Further, VDOC agreed to permit deaf inmates access to videophone technology.

D. Provide an effective visual notification system that will notify deaf inmates of prison-wide events and events specific to deaf inmates.  VDOC acknowledged that deaf inmates incarcerated at VDOC state correctional facilities should not miss announcements, alarms, or any other auditory information from VDOC staff to the general inmate population solely because of their disability.

E. "Provide appropriate Auxiliary Aids and Services for all programs offered at VDOC facilities in which Deaf inmates are qualified, admitted into, and are actively participating in." Such programs include: Adult Education, Community College Courses, Vocational Programs, Correctional Enterprises Programs, and Rehabilitative Programs.

91.     In addition to the *Minnis* Settlement Agreement and other documented widespread abuses, VDOC is aware of each correctional facility's compliance with the Board's minimum

19

standards and other laws through VDOC's performance of triennial certification audits for each facility, yearly unannounced life, health, safety inspections of local and regional jails and lockups, and other monitoring visits. VDOC's auditing and monitoring responsibilities include maintaining oversight over any policies and procedures regarding the treatment of and services provided to disabled inmates and detainees. Upon information and belief, through required regular audits and inspections of Virginia jails, in particular by VDOC's Compliance and Accreditation Unit's "PREA and ADA Audits & Compliance" section, VDOC and Director Clarke are aware of the Sheriff's policies and practices regarding disabled individuals, and more specifically, the Sheriff's failure to provide Mr. Zemedagegehu and individuals like Mr. Zemedagegehu with effective communication in the form of a qualified ASL interpreter or other auxiliary aids at the Detention Facility. As a result, Director Clarke is also aware of VDOC's continued inaction and deficient inspection and monitoring of the Detention Facility in order to ensure the health, safety, and welfare of Plaintiff and other offenders under the Sheriff's custody and the Sheriff's compliance with all other applicable laws, regulations, and procedures.

92.     Further, through the above-referenced litigation and VDOC's required regular audits and inspections of Virginia jails, the Board and Chairman Peed are, upon information and belief, aware of the Sheriff's policies and practices regarding disabled individuals, and more specifically, the Sheriff's failure to provide Mr. Zemedagegehu and individuals like Mr. Zemedagegehu with effective communication in the form of a qualified ASL interpreter or other auxiliary aids at the Detention Facility. As a result, the Board and Chairman Peed are also aware of the Board's failure to institute minimum standards for Virginia's jails that would ensure compliance with Title II and Section 504.

93.    The State Agency Defendants are or should be aware that access to qualified interpreters, visual alerts, telecommunications devices, and other auxiliary aids are necessary to ensure that deaf inmates have equal and meaningful access to the services offered to similarly situated non-deaf inmates.  The State Agency Defendants likewise were aware or should have been aware that maintaining standards and/or certifying jails, like the Detention Facility, that fail to provide such reasonable accommodations posed a substantial risk that deaf inmates, like Mr. Zemedagegehu, would be denied their rights under Title II and Section 504. The State Agency Defendants likewise were aware or should have been aware that without their intervention, such a risk would continue.

## COUNT I
## (Title II of the Americans With Disabilities Act)

94.    Mr. Zemedagegehu repeats and re-alleges each and every allegation above as if fully set forth herein.

95.    On July 12, 1990, Congress enacted the Americans with Disabilities Act ("ADA") "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

96.    Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

97.    Title II of the ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the

receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

98.     Mr. Zemedagegehu has a disability because he is substantially limited in the major life activities of hearing and speaking. He also meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity. He is therefore a "qualified individual with a disability" under Title II of the ADA.

99.     The Sheriff's Office, managed and directed by the Sheriff, is a department, agency, special purpose district, or other instrumentality of the Commonwealth; as such, it is a "public entity" within the meaning of the ADA, 42 U.S.C. § 12131(1)(B).

100.     The Board, managed and directed by Chairman Carl Peed, is a department, agency, special purpose district, or other instrumentality of the Commonwealth; as such, it is a "public entity" within the meaning of the ADA, 42 U.S.C. § 12131(1)(B).

101.     VDOC, managed and directed by Director Harold Clarke, is a department of the Commonwealth; as such, it is a "public entity" within the meaning of the ADA, 42 U.S.C. § 12131(1)(B).

102.     At all times relevant to this action, the ADA was in full force and effect in the United States and Mr. Zemedagegehu had a right not to be subjected by Defendants to discrimination on the basis of his disability. 42 U.S.C. § 12132.

103.     The U.S. Department of Justice ("DOJ") regulation implementing Title II of the ADA clearly requires the provision of effective communication as a part of its nondiscrimination mandate. 28 C.F.R. § 35.160.

104.    The regulation states that "[a] public entity shall take appropriate steps to ensure that communications with applicants, participants, and members of the public . . . with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a).

105.    Defendants' failure to provide effective communication for Mr. Zemedagegehu denied, on the basis of his disability, Mr. Zemedagegehu the same access to Defendants' services, benefits, activities, programs, or privileges as the access provided to hearing individuals.

106.    To ensure effective communication, the ADA requires that "a public entity shall furnish appropriate auxiliary aids and services where necessary to afford qualified individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program or activity conducted by a public entity." 28 C.F.R. § 35.160(b)(1). Auxiliary aids and services include, but are not limited to, "qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments," 42 U.S.C. § 12103, such as videophones and videotext displays. 28 C.F.R. § 35.104.

107.    In determining what type of auxiliary aid and service is necessary, "a public entity shall give primary consideration to the requests of the individual with disabilities." 28 C.F.R. § 35.160(b)(2).

108.    Defendants knowingly and intentionally failed to provide Mr. Zemedagegehu with an ASL interpreter and other necessary auxiliary aids or services he requested, subjected him to discrimination, and/or maintained policies and procedures that had a disparate impact on Mr. Zemedagegehu because of his disability resulting in Mr. Zemedagegehu being denied the same benefits and services available to non-deaf inmates. Among other things, as a result of Defendants' failures, Mr. Zemedagegehu was:

    a.    Unable to effectively communicate with the Sheriff's officers and other personnel during the booking process;

      b.   Unable to effectively communicate with the Sheriff's personnel performing medical functions;

      c.   Unable to effectively communicate dietary needs;

      d.   Deprived of access to telephone calls;

      e.   Deprived of access to counsel;

      f.   Deprived of access to meals and recreation times; and

      g.   Deprived of knowledge of and access to rehabilitative programming and other services.

109.    These failures violated Mr. Zemedagegehu's rights under Title II of the ADA.

110.    Defendants knew of the substantial likelihood of a violation of Mr. Zemedagegehu's federally protected rights and failed to act on this likelihood.

111.    Upon information and belief, the failure to provide effective communication to deaf individuals, such as Mr. Zemedagegehu, and the failure to provide comparable access to services, programs, and activities as provided to hearing individuals are policies, regular practices, or customs of the Defendants. This failure is ongoing and continues to date.

112.    As a result of Defendants' violation of the ADA, Mr. Zemedagegehu has suffered discrimination, exclusion from services, benefits, activities, programs, and privileges, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, trauma, embarrassment, and injury to his physical and mental health.

## COUNT II
### (Section 504 of The Rehabilitation Act of 1973)

113.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

114.    Section 504 states "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

115. Plaintiff is substantially limited in the major life activities of hearing and speaking; as such, he is an individual with a disability under 29 U.S.C. § 705(20)(B) who is qualified under Section 504.

116. The Sheriff's Office, as managed and directed by the Sheriff, is a "program or activity receiving Federal financial assistance" because it is "a department, agency, special purpose district, or other instrumentality of a State or of a local government" and is recipient of federal financial assistance because it receives federal financial assistance, including but not limited to federal prisoner expense reimbursements. 29 U.S.C. § 794(b)(1), (4).

117. The Board is a "program or activity receiving Federal financial assistance" because it is "a department, agency, special purpose district, or other instrumentality of a State or of a local government" and, upon information and belief, is a recipient of federal financial assistance. 29 U.S.C. § 794(b)(1)(A), (B).

118. VDOC is a "program or activity receiving Federal financial assistance" because it is "a department . . . of a State" that receives federal prisoner expense reimbursements, Medicaid funds, and grants pursuant to the Prison Rape Elimination Act, among other assistance. 29 U.S.C. § 794(b)(1).

119. The operations of Defendants are "program[s] or activit[es]" within the meaning of 29 U.S.C. § 794(b)(1)(A)-(B) and/or (b)(2)(B).

120. At all times relevant to this action, Section 504 was in full force and effect in the United States and Mr. Zemedagegehu had a right not to be subjected to discrimination on the basis of his disability by Defendants.

121. Defendants knowingly and intentionally failed to provide Mr. Zemedagegehu with an ASL interpreter and other necessary auxiliary aids or services he requested, subjected him to

discrimination, and/or maintained policies and procedures that had a disparate impact on Mr.

Zemedagegehu because of his disability resulting in Mr. Zemedagegehu being denied the same

benefits and services available to non-deaf inmates. Among other things, as a result of

Defendants' failures, Mr. Zemedagegehu was:

a.   Unable to effectively communicate with the Sheriff's guards and other personnel during the booking process;

b.   Unable to effectively communicate with the Sheriff's employees performing medical functions;

c.   Unable to effectively communicate dietary needs;

d.   Deprived of access to telephone calls;

e.   Deprived of access to counsel

f.   Deprived of access to meals and recreation times; and

g.   Deprived of knowledge of and access to rehabilitative programming and other services.

122.    These failures violated Mr. Zemedagegehu's rights under Section 504.

123.    Defendants knew of the substantial likelihood of a violation of Mr.

Zemedagegehu's federally protected rights and failed to act on this likelihood.

124.    Upon information and belief, the failure to provide effective communication to

deaf individuals, such as Mr. Zemedagegehu, and the failure to provide comparable access to

services, programs, and activities as provided to hearing individuals are policies, regular

practices, or customs of the Defendants. This failure is ongoing and continues to date.

125.    As a result of the Defendants' violation of Section 504, Mr. Zemedagegehu has

suffered discrimination, exclusion from services, benefits, activities, programs, and privileges,

loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, trauma,

embarrassment, and injury to his physical and mental health.

## **JURY DEMAND**

126.    Plaintiff hereby demands that this action be tried before a jury.

## PRAYER FOR RELIEF

127.    WHEREFORE, Plaintiff respectfully requests that the Court provide the following relief:

a.  Declare that Defendants' discrimination on the basis of Mr. Zemedagegehu's disability, refusal to provide a qualified ASL interpreter and other necessary auxiliary aids or services to ensure effective communication with Mr. Zemedagegehu, and/or maintenance of policies and procedures that had a disparate impact on Mr. Zemedagegehu because of his disability violated Title II of the ADA and Section 504 of the Rehabilitation Act;

b.  Award compensatory damages as a result of the violations of Title II of the ADA and Section 504 of the Rehabilitation Act in an amount to be determined at trial;

c.  Award reasonable costs and attorneys' fees; and

d.  Award any and all other legal or equitable relief that the Court deems necessary and appropriate.

Dated: February 19, 2015

Respectfully submitted,

By: */s/ Jonathan Goodrich*
Larry Tanenbaum (*admitted pro hac vice*)
Jonathan Goodrich (VSB 78522)
Carolyn Perez (*admitted pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue N.W.
Washington, DC 20036
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
Email: jgoodrich@akingump.com

Caroline E. Jackson, Esq. (*admitted pro hac vice*)
Debra J. Patkin, Esq. (*admitted pro hac vice*)
NATIONAL ASSOCIATION OF THE DEAF
LAW AND ADVOCACY CENTER
8630 Fenton Street, Suite 820
Silver Spring, MD 20910
Telephone: (301) 587-7466
Facsimile: (301) 587-1791
Email: caroline.jackson@nad.org

*Counsel for Plaintiff*