IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

ABREHAM ZEMEDAGEGEHU,          )
                               )
     Plaintiff,                )
                               )
          v.                   )     1:15cv57 (JCC/MSN)
                               )
ARLINGTON COUNTY SHERIFF       )
ELIZABETH F. ARTHUR, in her    )
official capacity, <u>et al.</u>,     )
                               )
     Defendants.               )

**M E M O R A N D U M   O P I N I O N**

Plaintiff Abreham Zemedagegehu ("Plaintiff"), a deaf
man who communicates using American Sign Language ("ASL"),
brought this action under Title II of the Americans with
Disabilities Act, 42 U.S.C. §§ 12131-12165 ("Title II"), and
Section 504 of the Rehabilitation Act of 1972, 29 U.S.C. § 794
("Section 504"), based on the collective Defendants' alleged
failure to provide Plaintiff with auxiliary aids and services
necessary to communication, and their alleged failure to make
reasonable accommodations of their policies and procedures,
during Plaintiff's temporary incarceration at the Arlington
County Detention Facility (the "jail").

This matter is before the Court on two separately
filed motions to dismiss.  Defendant Elizabeth F. Arthur, the
Arlington County Sheriff, in her official capacity (the

1

"Sheriff") filed a motion to dismiss the Title II ADA claim against her.  (Sheriff's Mot. to Dismiss [Dkt. 30]; Sheriff's Mem. in Supp. [Dkt. 31].)  Defendants Virginia Department of Corrections ("VDOC"), Harold W. Clarke, VDOC Director, in his official capacity (the "VDOC Director"), Virginia Board of Corrections (the "Board"), and Carl R. Peed, Chairman of the Board, in his official capacity (collectively the "State Defendants") filed a motion to dismiss the amended complaint against them in its entirety.  (State Defs.' Mot. to Dismiss [Dkt. 36]; State Defs.' Mem. in Supp. [Dkt. 37].)  For the following reasons, the Court will deny the Sheriff's motion and grant the State Defendants' motion.

## I. Background

At the motion to dismiss stage, the Court must read the complaint as a whole, construe the complaint in a light most favorable to the plaintiff, and accept the facts alleged in the complaint as true.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

Plaintiff is deaf and has no functional ability to speak English or to read lips.  (Am. Compl. [Dkt. 21] ¶¶ 12, 15.)  Plaintiff was born and raised in Ethiopia but became a United States citizen in 2008.  (Id. at ¶ 11.)  He does know limited English through courses he took at Gallaudet University, but he "struggles" to read, write, and understand even basic English sentences.  (Id. at ¶ 15.)  Plaintiff's primary language

is ASL and his employment history is limited to manual labor jobs that do not require proficiency in spoken or written English.  (Id. at ¶¶ 14, 16.)

On February 2, 2014, Plaintiff was arrested at Ronald Reagan Washington National Airport ("National Airport") after he went there to find somewhere warm to sleep.[1]  (Am. Compl. ¶¶ 18-19.)  Shortly after his arrest, in the early morning hours of February 3, 2014, Plaintiff was transported to the jail where he started the booking process.  (Id. at ¶ 25.)  Plaintiff attempted to communicate with the National Airport police officers and jail personnel using gestures and in writing.  (Id. at ¶¶ 20, 26.)  Plaintiff also requested an ASL interpreter but one was not provided.  (Id.)  Consequently, Plaintiff did not know why he had been arrested nor did he understand why he was being detained in the jail.  (Id. at ¶ 27.)  Plaintiff also appeared in front of a judge via video conference, but he could not signal to the judge that he was deaf because jail personnel instructed him to remain still.  (Id. at ¶ 28.)

As part of the booking process, Plaintiff underwent a medical evaluation, where he made additional requests for assistance.  (Am. Compl. ¶¶ 26-36.)  His requests were again denied.  (Id.)  Without an ASL interpreter, Plaintiff did not

---

[1] Plaintiff resides in Washington, D.C., but currently has no fixed address.  (Id. at ¶ 4.)

understand the medical evaluation process and refused to sign a consent form that he could not read. (Id. at ¶¶ 37-39.) Jail personnel then forced a needle into Plaintiff's arm without his consent and placed him in isolation. (Id. at ¶¶ 40-43.) Scared and confused, Plaintiff banged on the cell door and repeatedly gestured for assistance, still unaware as to why he was being incarcerated. (Id. at ¶ 43.) Plaintiff had a negative skin reaction to the forced medical procedure and underwent an additional medical procedure, but still did not understand what was happening. (Id. at ¶ 44.)

Approximately 24 hours after his arrest, on February 4, 2014, Plaintiff was arraigned in Arlington County General District Court through the assistance of an ASL interpreter. (Am. Compl. ¶¶ 32-33.) At his arraignment, Plaintiff first learned he had been arrested and incarcerated for allegedly stealing an iPad. (Id.) Plaintiff returned to the jail after his arraignment and remained incarcerated for nearly six weeks. (Id. at ¶ 23.) During his period of incarceration, Defendants refused to provide effective means for Plaintiff to communicate, and consequently, Plaintiff was deprived of meals (id. at ¶¶ 46-48), recreation (id. at ¶¶ 70-75), and rehabilitative services at various times (id. at ¶¶ 76-83).[2]

_____

[2] The Jail uses auditory alerts to signal the beginning of meal and recreation times. (Am. Compl. ¶ 71.) When inmates hear the

During Plaintiff's incarceration, the jail also failed to provide Plaintiff with an adequate accommodation for telephone access.  (Am. Compl. ¶¶ 49-65.)  The jail offered to provide Plaintiff with a teletypewriter ("TTY") to make phone calls.  (<u>Id.</u> at ¶ 56.)  However, Plaintiff could not communicate effectively using TTY because TTY requires proficiency in English.  (<u>Id.</u> at ¶ 57.)  The jail does not have a videophone or any device equipped with videophone software that Plaintiff could have used to make telephone calls.  (<u>Id.</u> at ¶¶ 50-52.) Plaintiff attempted to place a telephone call to a friend using TTY, but was unsuccessful.  (<u>Id.</u> at ¶¶ 59-60.)  Subsequently, an officer at the jail placed a call to Plaintiff's friend, who eventually visited Plaintiff at the jail.  (<u>Id.</u> at ¶¶ 62-63.) Because of the lack of a videophone, Plaintiff was unable to place telephone calls for the duration of his incarceration at the jail.  (<u>Id.</u> at ¶ 64.)  Plaintiff also could not regularly communicate with his court-appointed attorney via telephone, unlike other inmates, and instead relied on in-person visits made on the attorney's own accord.  (<u>Id.</u> at ¶¶ 66-69.)

---

alert, they press a button to open their cell doors.  (<u>Id.</u>) When Plaintiff was in isolation, he could not hear the auditory alert and repeatedly missed meals and recreation time.  (<u>Id.</u> at ¶ 73.)  Once in general population, Plaintiff learned how the auditory signal worked by observing other inmates.  (<u>Id.</u>) Consequently, Plaintiff missed meals approximately two to three times per week and missed recreation times approximately one time per week, due to the lack of auxiliary aids.  (<u>Id.</u> at ¶ 74.)

Plaintiff claims that Defendants violated Title II of the ADA and Section 504 of the Rehabilitation Act by knowingly and intentionally failing to provide him with an ASL interpreter or other auxiliary aids and accommodations, which denied him the same benefits and services available to non-deaf inmates.  (Am. Compl. at ¶¶ 108, 121.)  Specifically, as a result of these violations, Plaintiff claims that he was unable to communicate with jail personnel during the booking process and medical procedures, that he was unable to effectively communicate his dietary needs, and that he was deprived access to telephone calls, access to counsel, meals and recreation, and rehabilitative services.  (Id.)  Plaintiff seeks declaratory and compensatory relief.  (Id. at 27.)

In her motion to dismiss the Title II claim in count one, the Sheriff argues that she is immune from suit under the Eleventh Amendment and that Title II does not abrogate her sovereign immunity.  (Sheriff's Mem. at 4-8.)  The Sheriff does not contest the Section 504 claim in count two.  The State Defendants present two arguments in their motion to dismiss. First, the State Defendants argue that they are not liable on either count one or count two for the actions of the Sheriff, who is solely responsible for operation of the jail.  (State Defs.' Mem. at 3-7.)  Second, the State Defendants argue that they are also immune from suit under the Eleventh Amendment and

ask that the Title II claim in count one be dismissed.  (Id. at 8-10.)  Both motions have been fully briefed and are ripe for disposition.

## II. Legal Standard

All Defendants filed their motion to dismiss based on sovereign immunity under the Eleventh Amendment, at least in part.  The United States Court of Appeals for the Fourth Circuit has not resolved "whether a dismissal on Eleventh Amendment immunity grounds is a dismissal for failure to state a claim under Rule 12(b)(6) or a dismissal for lack of subject matter jurisdiction under Rule 12(b)(1)."  Andrews v. Dew, 201 F.3d 521, 525 n.2 (4th Cir. 2000) (citations omitted).  "The recent trend, however, appears to treat Eleventh Amendment immunity motions under Rule 12(b)(1)."  Skaggs v. W. Reg'l Jail, Civ. A. No. 3:13-3293, 2014 WL 66645, at *4 (S.D.W. Va. Jan. 8, 2014) (citations omitted); see also Roach v. W. Va. Reg'l Jail & Corr. Auth., 74 F.3d 46, 48 (4th Cir. 1996) ("[T]he Eleventh Amendment limits the ability of a federal district court to exercise its subject-matter jurisdiction over an action brought against a state or one of its entities.").

Whether the Court evaluates the pending motions to dismiss with respect to the Eleventh Amendment immunity issue under Rule 12(b)(1) or Rule 12(b)(6) makes little practical difference, however.  See Beckham v. Nat'l R.R. Passenger Corp.,

569 F. Supp. 2d 542, 547 (D. Md. 2008) (citation omitted).  "A
Rule 12(b)(1) motion to dismiss for lack of subject matter
jurisdiction may contend either (1) that the complaint fails to
allege facts sufficient to establish subject matter jurisdiction
or (2) the alleged jurisdictional facts are untrue."  Id.
(citing Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982)).
Defendants contend the factual allegations are insufficient and
do not establish the abrogation of their sovereign immunity
under the Eleventh Amendment.  Thus, the Court must accept the
allegations in the amended complaint as true and construe them
in a light most favorable to Plaintiff, just as it would under a
motion pursuant to Rule 12(b)(6).  Id.

### III. Analysis

The Sheriff and the State Defendants argue that under
the Eleventh Amendment, they are immune from Plaintiff's Title
II claim in Count One.  The State Defendants additionally argue
that Plaintiff has failed to plead sufficient facts to establish
supervisory liability between the jail, its employees, and the
State Defendants.  The Court first addresses the State
Defendants' supervisory liability.

### A. Supervisory Liability of the State Defendants

The State Defendants contend they are not liable for
acts that occur in the jail, which is run solely by the Sheriff,
and ask for dismissal from the lawsuit on this basis.  (State

Defs.' Mem. at 3-7.)  Stated differently, the State Defendants argue that Plaintiff fails to state a claim for relief because under Virginia law, the State Defendants are too far removed from the day-to-day operations of the jail and do not perform any supervisory function.  (State Defs.' Reply [Dkt. 57] at 1-7.)  Plaintiff argues that the State Defendants are liable under a theory of supervisory liability.[3]  (Pl.'s Opp'n to State Defs. [Dkt. 40] at 14-18.)  For the following reasons, the Court will grant the State Defendants' motion and dismiss them from this lawsuit.

The parties agree that to state claims against the State Defendants under a theory of supervisory liability, which is most often used in the context of 42 U.S.C. § 1983 litigation, a "plaintiff must show actual or constructive knowledge of a risk of constitutional injury, deliberate indifference to that risk, and an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff."  Carter v.

---

[3] The amended complaint does not assert liability under a theory of respondeat superior, but instead, supervisory liability, which is the appropriate basis in this circuit.  See Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994) ("[L]iability is not premised upon respondeat superior but upon 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.") (quoting Slakan v. Porter, 737 F.2d 368, 372-73 (4th Cir. 1984)).

Morris, 164 F.3d 215, 221 (4th Cir. 1999) ("[R]espondeat superior is not the standard.") (quoting Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994)).  Implicit in the third element of the prima facie case is that the State Defendants must act as supervisors or "supervisory employees" whose inaction or deliberate indifference affirmatively caused the particular constitutional injury that Plaintiff has suffered.  See Shaw, 13 F.3d at 798 (stating "supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates.").  Moreover, this inaction must itself be a "direct cause" of the injury alleged, which is a heavy burden.  Newbrough v. Piedmont Reg'l Jail Auth., 822 F. Supp. 2d 558, 586 (E.D. Va. 2011).

Plaintiff alleges that Chairman Peed and the Board establish minimum standards regarding the health, safety, and welfare of all correctional facility inmates in Virginia, and that Director Clarke and the VDOC monitors implementation and enforcement of those standards.  (Am. Compl. ¶¶ 85-86.); see also Va. Code §§ 53.1-5, 53.1-10.  But as a matter of law, local county Sheriffs in the Commonwealth of Virginia are independent constitutional officers solely responsible for the operation of their local jail.  See Va. Const., art. VII, § 4 ("There shall be elected by the qualified voters of each county and city a treasurer, a sheriff, an attorney for the Commonwealth, a clerk

10

. . . and a commissioner of revenue."); see also Va. Code §
53.1-116.2 ("The sheriff of each county or city shall be the
keeper of the jail thereof[.]").  It is of no import that
Plaintiff alleges the deliberate indifference of the State
Defendants actually caused the constitutional injuries he
suffered.  This is because it is undisputed that Plaintiff was
incarcerated at the Arlington County Detention Facility, a local
jail where Sheriff Arthur and the deputies who work under her
command are responsible for applying the standards and policies
set by the State Defendants.  Therefore, for the following
reasons, Plaintiff fails to state a claim for relief against the
State Defendants for any alleged injury that occurred during his
incarceration in the jail.

First, under the Virginia Code, local Sheriffs are
solely responsible for running the locality's jail.  Plaintiff
alleges the State Defendants, in their policy-setting role, had
constructive knowledge of the deficient accommodations and aids
available to deaf detainees in local jails throughout the
Commonwealth of Virginia.  See Guerrero v. Deane, 750 F. Supp.
2d 631, 657 (E.D. Va. 2010).  On a Rule 12(b)(6) motion the
Court assumes this allegation to be true.  Regardless, "[t]he
primary responsibility for application of [the Board's]
standards shall be with the sheriff or chief executive officer
of the jail or lockup."  6 Va. Admin. Code § 15-40-20; see also

Va. Code § 53.1-116.2 ("The sheriff of each county or city shall be the keeper of the jail thereof[.]").  Admittedly, the State Defendants are responsible for setting policies and auditing correctional facilities for compliance with those policies.  But the Board and the VDOC do not apply or enforce these policies in local jails as Plaintiff alleges.  As a matter of Virginia law, that responsibility resides only with the Sheriff.  Instead, state correctional facilities, i.e. state prisons or penitentiaries, house convicted offenders sentenced to a year or more of incarceration and are "operated by the Department of Corrections[.]"  Va. Code § 53.1-1.  The Virginia Code expressly distinguishes between state correctional facilities (Chapter 2 under Title 53.1) and local correctional facilities like the jail (Chapter 3 under Title 53.1).  Compare Va. Code § 51.1-18 through § 53.1-67.8, with Va. Code § 53.1-68 through 53.1-133.10.

Second, the State Defendants do not supervise the Sheriff in the manner contemplated under the prima facie case of supervisory liability.  While the Virginia Code does provide the Board with certain enforcement mechanisms to ensure compliance with standards and policies, the mechanisms are indirect and do not give the Board direct supervisory authority over sheriffs or the operation of the local jail.  For one, Sheriffs are not employees of the Commonwealth of Virginia and thus not subject

to supervision by Virginia agencies.  See Doud v. Commonwealth, 717 S.E.2d 124, 126 (Va. 2011) ("[T]he sheriff of Russell County was not an 'employee' of the Commonwealth within the definitions contained in the [Virginia Tort Claims Act].  The sheriff's deputies and jailors were employees of the sheriff, not of the Commonwealth.").  Instead, Virginia sheriffs are independent constitutional officers who are responsible only to the voters. Id. ("Constitutional officers are responsible to the voters who elected them but do not depend upon either the government of the Commonwealth or upon the governing bodies of their counties or cities for their authority."); see also Va. Const. art. 7, § 4. As the manager of the jail, the Sheriff is also responsible for the sheriff deputies who work in the jail.  See Va. Code § 53.1-68 ("The sheriff shall establish minimum performance standards and management practices to govern the employees for whom the sheriff is responsible.").

The Board can indirectly affect the operation of the jail, but not to the degree required for supervisory liability to attach.  For instance, the Board may prohibit confinement and require transfer of prisoners in substandard jails.  Va. Code § 53.1-69.  But only the local circuit court can directly penalize the Sheriff for failure to properly operate the jail.  Compare Va. Code § 53.1-69, with Va. Code § 53.1-118 ("If it appears to the circuit court having jurisdiction that the sheriff or jail

superintendent has in any respect failed to perform his duties
with respect to operation of the jail, the court may, after
summoning him to show cause against it, summarily fine him not
more than fifty dollars."). Additionally, under the Virginia
Code, the Board can file a lawsuit against the Sheriff for
failure to comply with any requirements set by the Board. See
Va. Code § 53.1-125. Notably, however, the Virginia Code does
not provide any other enforcement mechanism, and if the circuit
court deems the complaint "justified, it shall enter an order
directing the State Compensation Board to withhold approval of
payment of any further salary to the sheriff . . . until there
has been compliance with specified requirements of the Board."
Id. In short, while there are indirect enforcement mechanisms
available to the Board and local circuit court to ensure the
local jail's compliance with standards and requirements, as a
matter of Virginia law, these statutory provisions do not
establish the "affirmative causal link" necessary between the
State Defendants and the particular constitutional injury
suffered by Plaintiff for supervisory liability to attach.
Stated differently, by way of analogy, under Virginia law,
assuming the other elements were satisfied, the Sheriff herself
could theoretically be liable for any inaction related to her
deputies who she directly manages under a theory of supervisory
liability. See Va. Code § 53.1-68. But the relationship

14

between the State Defendants and the operation of local correctional facilities throughout Virginia is indirect and insufficient as a matter of law.

Ultimately, Plaintiff's claims against the State Defendants cannot survive given his inability to establish "an affirmative causal link between the supervisor's [State Defendants'] inaction and the harm suffered by the plaintiff." Id. (quoting Slakan, 737 F.2d at 376; Rizzo v. Goode, 423 U.S. 362 (1976)).  Therefore, the Court will grant the State Defendants motion to dismiss and dismiss this matter with prejudice as to them.  This result does not totally prevent Plaintiff's potential recovery, because as discussed below, both counts will remain against the Sheriff in her official capacity as keeper of the jail.

### B. The Sheriff's Motion to Dismiss Title II Claim

By enacting Title II of the ADA, Congress "invoke[d] the sweep of congressional authority, including the power to enforce the fourteenth amendment . . . in order to address the major areas of discrimination faced day-to-day by people with disabilities."  42 U.S.C. § 12101(b)(4).  Title II of the ADA provides:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be

15

> subjected to discrimination by any such
> entity.

42 U.S.C. § 12132.  For purposes of the pending motions to

dismiss, it is undisputed that Plaintiff is a "qualified

individual with a disability" and the jail is a "public entity"

under Title II, which expressly authorizes suits by private

citizens for money damages against public entities that violate

section 12132.  42 U.S.C. § 12133 (incorporating 29 U.S.C. §

794a).  To state a claim for relief under Title II of the ADA,

Plaintiff must allege: (1) he has a disability; (2) he is

otherwise qualified to receive the benefits of a public service,

program, or activity; and (3) he was excluded from participation

in or denied the benefits of such service, program, or activity,

or otherwise discriminated against, on the basis of his

disability.  Constantine v. Rectors & Visitors of George Mason

Univ., 411 F.3d 474, 498 (4th Cir. 2005) (citations omitted).

Stated differently, "if a person is disabled and otherwise

qualified, the state must ensure that the person is not denied

the benefits of services, activities, or programs because of his

or her disability."  Chase v. Baskerville, 508 F. Supp. 2d 492,

498 (E.D. Va. 2007).

The Sheriff does not contest the sufficiency of

Plaintiff's allegations to support a prima facie case under

Title II.  Instead, the Sheriff contends she is immune from suit

16

under the Eleventh Amendment and that Congress did not validly abrogate her sovereign immunity by enacting Title II.

### 1. Abrogation of Sovereign Immunity

Sovereign immunity under the Eleventh Amendment applies not only to the state itself but "extends also to 'state agents and state instrumentalities' . . . or stated otherwise to 'arm[s] of the State.'"  Cash v. Granville Cnty. Bd. of Educ., 242 F.3d 219, 222 (4th Cir. 2001) (citations omitted).  It is well-established that a suit against a state official in his or her official capacity should be treated as an action against the state.  Hafer v. Melo, 502 U.S. 21, 25 (1991); see also Kitchen v. Upshaw, 286 F.3d 179, 183-84 (4th Cir. 2002) ("The Eleventh Amendment limits the Article III jurisdiction of the federal courts to hear cases against States and state officers acting in their official capacities.").  Here, filing suit against the Arlington County Sheriff in her official capacity is treated as an action against the state subject to Eleventh Amendment immunity.  See Vollette v. Watson, 937 F. Supp. 2d 706, 714 (E.D. Va. 2013) ("Based on [Virginia law], federal district courts applying Virginia law have repeatedly held that Virginia Sheriffs, and their deputies, are 'state officers' for the purpose of the Eleventh Amendment.").

Nonetheless, the Sheriff is still subject to suit if (1) she unambiguously consents to that suit or (2) Congress,

acting under powers granted to it in section five of the Fourteenth Amendment, has clearly abrogated her immunity. See Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 54-55 (1996); see also Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 242 (1985). Because it is undisputed that the Sheriff did not consent to this suit under Title II, count one in the amended complaint survives only if Congress acted within its power to clearly abrogate her immunity.[4] To make this determination, the Court "must resolve two predicate questions: first, whether Congress unequivocally expressed its intent to abrogate that immunity; and second, if it did, whether Congress acted pursuant to a valid grant of constitutional authority." Tennessee v. Lane, 541 U.S. 509, 517 (2004) (quoting Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 73 (2000)).

The first question is well-settled: Congress unequivocally expressed its intent under Title II to abrogate a state's Eleventh Amendment sovereign immunity. Lane, 541 U.S. at 518 (citing 42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent

---

[4] The Sheriff validly waived her immunity from suit under Section 504 of the Rehabilitation Act in count two of the amended complaint. See Constantine, 411 F.3d at 496 (holding that recipients of federal financial assistance waive sovereign immunity under Section 504 of the Rehabilitation Act). Indeed, the Sheriff does not seek dismissal of count two.

jurisdiction for a violation of this chapter.")).  Thus, the

thrust of this Court's inquiry concerns the second question:

whether Congress enacted Title II pursuant to a valid grant of

constitutional authority, i.e. the enforcement power in Section

5 of the Fourteenth Amendment.  Id. at 517; see also Nev. Dep't

of Human Res. v. Hibbs, 538 U.S. 721, 727-28 (2003) ("[T]he

Eleventh Amendment, and the principle of state sovereignty which

it embodies, are necessarily limited by the enforcement

provisions of § 5 of the Fourteenth Amendment.") (quoting

Fitzpatrick v. Bitzer, 427 U.S. 445, 456 (1976) (citation

omitted)); Chase, 508 F. Supp. at 498 ("[T]he only question 'is

whether Congress had the power to give effect to its intent.'")

(quoting Lane, 541 U.S. at 518).

Congress has the power under Section 5 of the

Fourteenth Amendment to enforce the provisions in Section 1 of

the Fourteenth Amendment "by creating private remedies against

the States for actual violations of those provisions."  United

States v. Georgia, 546 U.S. 151, 158-59 (2006) (holding a

paraplegic inmate's Title II claims for money damages were

based, at least in part, on conduct that actually violated the

Eighth Amendment and thus actually violated Section 1 of the

Fourteenth Amendment, including the deliberate refusal of prison

officials to accommodate the inmate's disability-related needs

in such fundamentals as mobility, hygiene, medical care, and almost all other prison programs) (emphasis in original).

Here, first, Plaintiff has not alleged actual violations of the Fourteenth Amendment.  Instead, his amended complaint states two statutory causes of action: one under the ADA and the second under the Rehabilitation Act.  Chase is instructive on this issue.  There, the deaf Virginia state prisoner filed a civil rights action alleging "the failure to provide him with an interpreter to assist him in his school work violated his rights under the Due Process Clause of the Fourteenth Amendment, the Eighth Amendment, the Rehabilitation Act, and Title II of the Americans with Disabilities Act (ADA)." 508 F. Supp. 2d at 497.  Here, in contrast, Plaintiff's amended complaint alleges the failure to provide him with an ASL interpreter in the jail violated only his rights under Title II (count one) and Section 504 (count two).  (See generally Am. Compl. at 21-26.)  He does not expressly allege that the jail's failure to provide an interpreter actually violated his rights under the Fourteenth Amendment.  Stated differently, Plaintiff does not raise a claim under 42 U.S.C. § 1983 to vindicate any actual violations of his constitutional rights.  Thus, the Court's decision on this issue is not controlled by Georgia.

Instead, the issue now before this Court is, and the question left unanswered in Georgia was--assuming Plaintiff

20

failed to allege an actual Fourteenth Amendment violation--
whether Title II is within the scope of Congress's prophylactic
enforcement powers in Section 5 as an appropriate remedy for
Plaintiff's alleged injuries.  See Hibbs, 538 U.S. at 728
("Section 5 legislation reaching beyond the scope of § 1's
actual guarantees must be an appropriate remedy for identified
constitutional violations, not 'an attempt to substantively
redefine the States' legal obligations.") (quoting Kimel, 528
U.S. at 88); see also Lane, 541 U.S. at 518 (recognizing
Congress's power under Section 5 is broad and includes "the
authority both to remedy and to deter violation of rights [by
the Fourteenth Amendment and] by prohibiting a somewhat broader
swath of conduct, including that which is not itself forbidden
by the Amendment's text.") (quoting Kimel, 528 U.S. at 81
(quoting City of Boerne v. Flores, 521 U.S. 507, 518 (1997))).
Section 5 authorizes the enactment of "prophylactic legislation
proscribing practices that are discriminatory in effect, if not
in intent, to carry out the basic objectives of the Equal
Protection Clause."  Lane, 541 U.S. at 520.  The scope of
Congress's power in this regard remains unsettled.  See Georgia,
546 U.S. at 158 ("[T]he Members of this Court have disagreed
regarding the scope of Congress's 'prophylactic' enforcement
powers under § 5 of the Fourteenth Amendment . . . .")
(citations omitted).

Generally, legislation enacted pursuant to Section 5 of the Fourteenth Amendment is within Congress's prophylactic enforcement power if there is "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end."  Boerne, 521 U.S. at 520.  The parties agree that to make this determination, the Court employs a three-part test first announced by the Supreme Court in Boerne, 521 U.S. at 518, and re-affirmed in Lane, 541 U.S. at 522-30: (1) identify the scope of the constitutional right Congress sought to enforce when enacting Title II; (2) determine whether Congress identified a history and pattern of  unconstitutional disability discrimination; and (3) determine whether the remedies created by Title II are congruent and proportional to the constitutional violation.  See also Bd. of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 365-74 (2001).  With these standards in mind, the Court now turns to Plaintiff's allegations under the Title II claim in count one of the amended complaint against the Sheriff.

2. Application of the Boerne Test

The Sheriff argues that count one must be dismissed because Plaintiff fails to sufficiently plead an actual Fourteenth Amendment violation.  (Sheriff's Mem. at 4-8.) Moreover, the Sheriff argues that under the Boerne test, Title II does not validly abrogate her Eleventh Amendment sovereign

immunity because the accommodations provided for in Title II extend beyond Congress's prophylactic power in Section 5 of the Fourteenth Amendment. (Sheriff's Mem. at 4-6.) As support for her argument, the Sheriff relies heavily on this Court's holding in Chase v. Baskerville, 508 F. Supp. 2d 492, 499 (E.D. Va. 2007), and the general proposition that a prisoner's Fourteenth Amendment claims must be "analyzed in light of the special scrutiny and management concerns in the prison system." (Sheriff's Mem. at 5-8 (citing Morrison v. Garraghty, 239 F.3d 648, 655 (4th Cir. 2001).) But the facts of this case, as alleged in the amended complaint and when taken as true for purposes of this motion, require a different result for the following reasons.[5]

     In Chase, this Court held that "in the context of state prisons, Title II validly abrogates state sovereign immunity and 'creates a private cause of action for damages

---

[5] Unlike the district court that ultimately decided Morrison on summary judgment, this matter is now before the Court on a motion to dismiss, where the allegations in the amended complaint are taken as true, and the Court cannot resolve factual disputes of the validity of defenses or other justifications. At this early stage, and without any evidence in the record, it would be premature for the Court to address whether the Sheriff had a rational basis for her actions. See Butler v. United States, 702 F.3d 749, 752 (4th Cir. 2012) ("[I]mportantly, [a Rule 12(b)(6) motion] does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.") (citations and internal quotation marks omitted). Instead, this Court assumes the allegations in the Complaint are true for purposes of this motion, and construes them in a light most favorable to Plaintiff.

against the States' only 'for conduct that <u>actually</u> violates the Fourteenth Amendment.'"   508 F. Supp. 2d at 506 (emphasis in original).   The deaf <u>pro</u> <u>se</u> prisoner in <u>Chase</u> claimed "that the failure to provide him with an interpreter to assist him in his school work [and to allow him to access the prison's educational programs] violated his rights under . . . Title II of the [ADA]."   <u>Id.</u> at 497.   After applying the three-part test from <u>Boerne</u>, the Court concluded, under the facts of that case and in the context of a state prison, that "Title II's comprehensive remedial scheme" is incongruent and disproportionate "for those rights and the policy of judicial restraint in the prison context."   <u>Id.</u> at 501-506.

Put simply, in <u>Chase</u>, the district court was faced with conduct that did not violate the prisoner's constitutional rights, and the facts of that case are readily distinguishable from the allegations here regarding Plaintiff's pretrial period of incarceration in a local jail.   Moreover, the <u>Chase</u> court was concerned with much broader implications, including the possibility of setting a costly precedent where the requirements of Title II could be applied "to almost every interaction between inmates and prison officials[, which would impose significant] monetary liability upon the States for a host of actions in operating its prisons that are far removed from the . . . Due Process Clause . . . ."   <u>Id.</u> at 502.   Here, application

of the Boerne test to Plaintiff's allegations compels a much narrower holding: Title II validly abrogates a local sheriff's sovereign immunity in the pretrial, temporary detention setting of a local jail.  As in Chase, "the pivotal inquiry is the third step of the City of Boerne test."  Id. at 499.

> a. Step One: The Constitutional Rights at Issue

In Constantine, the Fourth Circuit recognized that "Title II seeks to enforce the Fourteenth Amendment's prohibition on irrational disability discrimination."  411 F.3d 474, 486 (4th Cir. 2005) ("Importantly, the Fourteenth Amendment does not forbid all discrimination based on disability . . . [and] States may make distinctions on the basis of disability so long as 'there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'") (quoting Heller v. Doe, 509 U.S. 312, 320 (1993)).  Indeed, "Title II seeks to curb arbitrary or irrational exclusion of disabled inmates from the services, programs, or benefits provided by the state and to prevent cruel and unusual punishment flowing from the denial of adequate facilities or services to disabled inmates."  Id. at 499-500 (citing Georgia, 546 U.S. 151 (2006); Lane, 541 U.S. at 525 n.11; Miller v. King, 384 F.3d 1248, 1272 (11th Cir. 2004), vacated and superseded by, 449 F.3d 1149 (11th Cir. 2006)); see also Georgia, 546 U.S. at 162-63 (Stevens, J., concurring) (recognizing the "constellation

25

of rights applicable in the prison context" under Title II).
Thus, like in Lane and Constantine, at issue here is the
Fourteenth Amendment's prohibition on irrational disability
discrimination.

### b. Step Two: History and/or Pattern of Conduct

Under the second step, the Court must "consider
whether Title II represents a legislative response to a pattern
of unconstitutional disability discrimination in public
services, programs, or activities generally." Constantine, 411
F.3d at 487. Lane conclusively established that Title II of the
ADA as a whole survives the historical inquiry under the second
step of the Boerne test. See id. ("After Lane, it is settled
that Title II was enacted in response to a pattern of
unconstitutional disability discrimination by States and
nonstate government entities with respect to the provision of
public services."); see also Chase, 508 F. Supp. 2d at 500
(citation omitted).  Thus, the second step is satisfied.

### c. Step Three: Congruence and Proportionality

"The remaining question is whether the remedial
measures contained in Title II represent a congruent and
proportional response to this demonstrated history and pattern
of unconstitutional disability discrimination." Constantine,
411 F.3d at 487-88 (citing Lane, 541 U.S. at 530).  Following
Lane and Constantine, this Court must consider Title II's

remedial measures only as applied to the right to be free from irrational disability discrimination in pretrial detention facilities like the jail.  Id.  There are two competing notions at play here.  On the one hand, Congress's remedy "may not work a substantive change in the governing law."  Chase, 508 F. Supp. 2d at 501 (quoting Lane, 541 U.S. at 250 (quoting Boerne, 521 U.S. at 519)).  Indeed, any remedy that "is so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior" does not fall within Congress's enforcement power under Section 5.  Chase, 508 F. Supp. 2d at 501 (quoting Boerne, 521 U.S. at 532).  On the other hand, however, Congress is given "wide latitude," and the remedy need not be a "perfect fit for the pattern of discrimination" at issue, so long as it falls "within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional."  Constantine, 411 F.3d at 490 (quoting Boerne, 521 U.S. at 518).

Plaintiff alleges that he is a qualified individual with a disability and Defendants are public entities as defined under Title II.  (Am. Compl. ¶¶ 96-107 (citing 42 U.S.C. § 12131).)  Specifically, Plaintiff claims that with "the provision of auxiliary aids and services, [he] meets the essential eligibility requirements for the receipt of services

or the participation in programs or activities provided by" the jail through Defendants. (Id.) Under Title II, Congress authorized the Attorney General to promulgate regulations that implement these provisions. 42 U.S.C. § 12134. Notably, "qualified inmates or detainees with disabilities shall not . . . be excluded from participation in, or be denied the benefits of, the services, programs or activities of a public entity, or be subjected to discrimination by any public entity." 28 C.F.R. § 35.152(b)(1). Under the regulations implementing Title II, jails are thus required to "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of [the jail]." 28 C.F.R. § 35.160(b)(1); see also 28 C.F.R. § 35.104(1) ("Auxiliary aids and services includes Qualified interpreters on-site or through video remote interpreting (VRI) services . . . video-based telecommunications products and systems, including text telephones (TTYs), videophones . . . or equally effective telecommunications devices . . . or other effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing."). The question before the Court is whether this "remedial scheme is an appropriately calibrated enforcement mechanism for those rights" in the context of local jails. Chase, 508 F. Supp. 2d

at 501.  For the reasons discussed below, Title II's remedies
are a congruent and proportional response to the pattern of
disability discrimination as applied to local jails.  See
Constantine, 411 F.3d at 487-88 (citing Lane, 541 U.S. at 530).

### i. Application and Distinction from Chase

Unlike the pro se plaintiff in Chase, a convicted and
sentenced Virginia state prisoner who sought an interpreter only
to access educational services in the state penitentiary, the
constitutional dimension of the temporary-detainee Plaintiff's
allegations here are congruent and proportional to the remedial
scheme of Title II.  Plaintiff's factual allegations implicate
important rights under the Fourteenth Amendment in at least
three ways, and the remedial scheme under Title II is
proportional to vindicate those rights, thus compelling
abrogation of the Sheriff's sovereign immunity under Title II.

First, inmates "possess[] a significant liberty
interest in avoiding the unwanted administration of
antipsychotic drugs under the Due Process Clause of the
Fourteenth Amendment."  Washington v. Harper, 494 U.S. 210, 221-
22 (1990) (citations omitted).  Plaintiff claims that during the
medical evaluation shortly after arriving at the jail, he was
handed a consent form to sign for a medical procedure, which he
could not read or understand and therefore refused to sign.
(Am. Compl. ¶ 38.)  Subsequently, after asking in writing for an

interpreter, a jail employee held down Plaintiff's "arm and forced a needle into it" without Plaintiff's consent and without any knowledge regarding the procedure.  (Id. at ¶¶ 39-40.) Plaintiff's "skin had a negative reaction to the forcible medical procedure that was conducted on his arm . . . [and he] underwent an additional medical procedure," again without the assistance of the interpreter and without knowing the purpose of the procedure.  When taking these facts as true and construing them in a light most favorable to Plaintiff, even though the exact nature of the forced intravenous procedure remains unknown at this early stage, Plaintiff's allegations implicate his rights under the Fourteenth Amendment.  See Harper, 494 U.S. 221-26.

Second, Plaintiff also alleges he appeared in front of a judge via closed circuit television during the booking process but could not understand or participate in the proceeding.  "The Due Process Clause of the Fourteenth Amendment and the Confrontation Clause of the Sixth Amendment, as applied to the States via the Fourteenth Amendment, both guarantee to a criminal defendant . . . the 'right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings."  Lane, 541 U.S. at 523 (quoting Faretta v. California, 422 U.S. 806, 819 n.15 (1975)).  The Tenth Circuit addressed this issue in Robertson v. Las Animas Cnty. Sheriff's

Dep't, 500 F.3d 1185 (10th Cir. 2007).  There, a deaf pretrial detainee was escorted to a room in the jail "to observe and participate in his probable cause hearing by closed-circuit television" when his attorney was present in the courtroom.  Id. at 1189.  The deaf pretrial detainee "did not know that he was attending his probable cause hearing, and he could not hear what the judge and his attorney were saying.  He told the detention officer that he could not hear what was going on, but she did nothing about it."  Id.  The Tenth Circuit held that because the deaf detainee was eligible to participate in the hearing, Title II applied, and he was denied the ability to participate in the hearing to the same extent as non-disabled individuals in violation of 42 U.S.C. § 12132.  Plaintiff alleges similar factual circumstances here.

During the booking process, jail personnel placed Plaintiff "in front of a web camera, a microphone, and a computer monitor that appeared to show a judge on the screen." (Am. Compl. ¶ 28.)  Plaintiff saw that the judge appeared to be speaking, but naturally could not hear, understand, or participate in the proceeding.  (Id.)  Moreover, when Plaintiff "attempted to signal that he was deaf . . . officers in the room . . . directed him to stay still . . . [and Plaintiff] does not know what occurred during that interaction with the judge." (Id.)  These allegations constitute more flagrant violations

than those in Robertson.  Not only did Plaintiff not understand the judicial proceeding, but jail personnel actively prevented his attempted participation, thus frustrating his right to be present at all stages of his trial.  Lane, 541 U.S. at 523. Accordingly, at this stage, Plaintiff sufficiently alleges facts that constitute an actual Fourteenth Amendment violation in this regard as well.

Third, Plaintiff alleges his access to counsel was restricted in violation of the Sixth Amendment, as applicable to the States under the Fourteenth Amendment.  "The Sixth Amendment right to counsel would be implicated if plaintiff was not allowed to talk to his lawyer for the entire four-day period." Tucker v. Randall, 948 F.2d 388, 390-91 (7th Cir. 1991) (citations omitted).  Here, in sum, Plaintiff alleges that because he uses ASL to communicate, he was unable to use the telephone for the duration of his six-week period of incarceration.  (Am. Compl. ¶¶ 49-69.)  To be clear, the jail does offer TTY services, and on at least one occasion, jail personnel seemed amenable to assist Plaintiff in making a telephone call to a friend.  But TTY services were useless for Plaintiff, who does not effectively read or write in English. And ultimately, he was unable to initiate communication with his court-appointed attorney via telephone, and instead, "could access his attorney only when the attorney came to the [jail] of

32

his own accord." (Id. at ¶ 67.) The factual allegations support a claim that Plaintiff was prevented from seeking and receiving the assistance of counsel throughout his six-week period of detention in violation of his Sixth Amendment right to counsel. See Procunier v. Martinez, 416 U.S. 396, 419 (1974) ("This means that inmates must have a reasonable opportunity to seek and receive the assistance of attorneys."), overruled in part on other grounds by, Thornburgh v. Abbott, 490 U.S. 401 (1989).[6]

The allegations at issue here also stand in stark contrast to the allegations and context of Chase. The Court in Chase concluded that "Title II imposes an affirmative accommodation obligation in the administration of state prisons that far exceeds what" is required by the Eighth Amendment, Due Process Clause, and Equal Protection Clause. 508 F. Supp. 2d at 501-505. Stated differently, the Court determined that in the prison context, Title II was not tailored to remedy likely constitutional violations. Id. at 505-506. The Court found that to hold otherwise would open Virginia to potential liability under Title II in most aspects of prison operation,

---

[6] The Court need not address all of Plaintiff's allegations, including his alleged deprivation of medical care and access to meals, recreational, and educational programming, having found the above-mentioned allegations implicated his rights under the Fourteenth Amendment, and that ultimately, count one will survive against the Sheriff.

including educational, rehabilitative, and vocational programming, "pervasive part[s] of prison life" that are offered free and apart from any constitutional obligation.  Id. at 505 ("Thus, where the States had no constitutional obligation to offer such programs, Title II potentially imposes liability on the States unless they adequately justify the lack of an interpreter or some other device to assist an inmate in enjoying the full benefits of the program.").

But here, the allegations at issue implicate Plaintiff's constitutional rights under the Fourteenth Amendment.  The legislative history of the ADA indicates congressional intent to specifically remedy the disparate treatment of inmates in local jails through enactment of Title II of the ADA.  See id. at 161-62 (citing 2 House Committee on Education and Labor, Legislative History of Public Law 101-336: The Americans with Disabilities Act, 101st Cong., 2d Sess., 1331 (Comm. Print 1990) (stating that persons with hearing impairments "have been arrested and held in jail over night without even knowing their rights nor what they are being held for")).  That is exactly the factual allegation here.  Moreover, the Supreme Court has suggested in dicta that Title II's remedial scheme was not limited to remedy only violations of the Eighth Amendment as applicable to the states through the Fourteenth Amendment.  See Georgia, 546 U.S. at 161 (Stevens,

J., concurring).  Thus, public entities do have a statutory
obligation under Title II to accommodate access to the most
basic jail services for deaf pretrial detainees, including, as
relevant here, access to medical procedure information and
access to the courts or counsel, as guaranteed under the
Fourteenth Amendment.  See, e.g., Georgia, 546 U.S. at 158.  The
provisions of Title II and the implementing regulations target
precisely the sort of discrimination that Congress sought to
address.

     The Chase court also recognized that this obligation
under Title II is limited by the "reasonable modification"
principle, which requires public entities "only to make
reasonable modifications that would not fundamentally alter the
nature of the service or activity of the public entity or impose
an undue burden."  Chase, 508 F. Supp. 2d at 506 (citing Bircoll
v. Miami-Dade Cnty., 480 F.3d 1072, 1082-83 (11th Cir. 2007)
(citing Lane, 541 U.S. at 531-32)).  But the district court in
Chase did not acknowledge the full breadth of the limitations
under the regulations, and thus ultimately concluded that Title
II's remedies were too far reaching.  Title II "does not require
a public entity to permit an individual to participate in or
benefit from the services, programs, or activities of that
public entity when that individual poses a direct threat to the
health or safety of others."  28 C.F.R. § 35.139.  And public

entities are only required to provide <u>necessary</u> accommodations,
those "that would not fundamentally alter the nature of the
service provided . . . [or] impose an undue financial or
administrative burden."  <u>Lane</u>, 541 U.S. at 532; <u>see also</u> 28
C.F.R. § 35.164.  At this stage, the Court need not speculate as
to the appropriate limitation of services and accommodations in
the pre-trial detention context of a local county jail.
However, here, as pled in the amended complaint, <u>no</u>
accommodation was provided that would have allowed Plaintiff to
access services in the jail in the same manner as non-disabled
inmates.  With these limits included in Title II's statutory
scheme, Title II's prophylactic and remedial scheme is congruent
and proportional to the pattern of disability discrimination.
<u>See</u> <u>Georgia</u>, 546 U.S. at 162 (Stevens, J., concurring); <u>see</u> <u>also</u>
<u>Constantine</u>, 411 F.3d at 490.

    Lastly, there is an important distinction between
temporary pretrial detention in a local jail and incarceration
in a state prison after conviction.  See <u>Bell v. Wolfish</u>, 411
U.S. 520, 535 n.16 (1979) ("Due Process requires that a pretrial
detainee not be punished.  A sentenced inmate, on the other
hand, may be punished, although that punishment may not be
'cruel and unusual' under the Eighth Amendment.") (citing
<u>Ingraham v. Wright</u>, 430 U.S. 651, 671-72 n.40 (1977)).  This
factual difference distinguishes this case from <u>Chase</u>, where the

Court was concerned only with the context of state
penitentiaries operated by the VDOC and not local correctional
facilities like the jail that are solely operated by the
Sheriff.  Chase, 508 F. Supp. 2d at 506.  As such, Plaintiff was
not required to endure "routine discomfort [as] part of the
penalty that criminal offenders pay for their offenses against
society."  Id. at 502-503 (quoting Hudson v. McMillian, 503 U.S.
1, 9 (1992)); see also Slade v. Hampton Roads Reg'l Jail, 407
F.3d 243, 250 (4th Cir. 2005) ("The Government concededly may
detain a criminal defendant to ensure his presence at trial and
may subject him to the restrictions and conditions of the
detention facility, so long as those conditions and restrictions
do not amount to punishment . . . .") (quoting Bell v. Wolfish,
441 U.S. 520, 536-37 (1979)).  Thus, this holding does not alter
the Court's holding in Chase, nor is it inconsistent, due to
this important factual distinction.

        In short, Plaintiff's allegations, if true,
demonstrate that Defendants wholly failed to accommodate
Plaintiff's disability as required by Title II and the
associated regulations, and consequently, Plaintiff was
completely unable to communicate with jail personnel regarding
medical procedures, unable to access the courts and participate
in the initial judicial proceeding conducted via closed circuit
television, and denied the right to counsel for approximately

six weeks.  Based on Plaintiff's allegations, at the motion to dismiss stage, it cannot be said that Title II "is so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior" and does not fall within Congress's enforcement power under Section 5.  Chase, 508 F. Supp. 2d at 501 (quoting Boerne, 521 U.S. at 532).  Instead, under the "wide latitude" given to Congress, while not a "perfect fit for the pattern of discrimination" at issue, within the context of a local jail, Title II falls "within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional."  Constantine, 411 F.3d at 490 (quoting Boerne, 521 U.S. at 518).  Accordingly, at this stage, the Eleventh Amendment poses no bar to Plaintiff's Title II claim in count one against the Sheriff.  Lane, 541 U.S. at 517; Constantine, 411 F.3d at 490.  Thus, the Court will deny the Sheriff's motion to dismiss count one.

## IV. Conclusion

For the foregoing reasons, the Court will grant the State Defendants' motion and deny the Sheriff's motion.  An appropriate Order shall issue.

/s/

April 28, 2015                                   James C. Cacheris
Alexandria, Virginia                 UNITED STATES DISTRICT COURT JUDGE